[Crim. No. 5460.   In Bank.   Feb. 26, 1954.]

THE PEOPLE, Respondent, v. REUBEN B. WEITZ, Appellant.

O'Gara & O'Gara and Paul P. O'Gara for Appellant.

Edmund G. Brown, Attorney General, Gail A. Strader, Deputy Attorney General, Chester E. Watson, District Attorney (San Joaquin), William Biddick, Jr., and Richard B. Daley, Deputy District Attorneys, for Respondent.

GIBSON, C. J.—Defendant Reuben B. Weitz was indicted on ten counts of grand theft, one count of conspiracy to commit grand theft, two counts of forgery and two counts of violation of the Corporate Securities Act. The jury returned a verdict against him on all counts except that of conspiracy, and he has appealed from the judgment of conviction and from an order denying him a new trial. The principal questions relate to the sufficiency of the evidence to support the convictions of grand theft and forgery.

In April 1949 Weitz was instrumental in forming a Califor-

nia corporation called Zesto Dairy Products, Inc. The proposed plan of operation was to establish and license retail ice cream stores to be operated by private individuals. At the time of incorporation Weitz was vice president and one of three directors, the others being Henry Nelson, who was president, and Walter D. Golding, who was secretary-treasurer.* When permission for issuance of stock was sought, the Commissioner of Corporations notified Weitz that the stock would have to be held in escrow if he were to remain an officer of the corporation. On May 20, 1949, Weitz filed a statement to the effect that he was resigning as vice president and director and that he was waiving all right, claim or interest in the corporation, and a permit to issue stock was granted because of his statement of withdrawal. About that time O. A. McCarty, a friend of Weitz, was ostensibly substituted as vice president and director in his place. There is evidence that McCarty did not attend any directors' meetings prior to 1950, although the minutes state that he was present at a number of meetings and participated in the action taken. He was present at two meetings in January or February of 1950. The minutes originally showed Weitz as making or seconding various motions, but they were subsequently rewritten at his request to substitute McCarty's name for his. Weitz claimed to be acting for McCarty and told Nelson that McCarty's name had to appear because Weitz was not an officer.

After the granting of a permit to sell stock 130 shares were issued, of which 100 were in the name of McCarty and fifteen each were in the names of Nelson and Golding. Nelson paid $500 for five shares of stock, and there is evidence that this was the only actual capital contributed by stockholders and that the rest of the stock was paid for by money which in fact belonged to the corporation and which came from sales of subdistributorships or from deposits made by prospective retailers. Although no stock was issued in the name of Weitz, he claimed to have furnished the money for most, if not all, of the McCarty shares. He stated that he controlled that stock by proxy, and he apparently exercised control over the corporation in that manner. While he did not appear of record as an officer, he

---

*Nelson was charged in the indictment with conspiracy, but the charge was dismissed as to him prior to trial. Golding was charged with conspiracy and with the ten counts of grand theft, and he was acquitted as to all counts. Alice Weitz, wife of Reuben, was charged with conspiracy and the two counts of forgery. She was convicted under the forgery counts but acquitted of conspiracy. She has not appealed.

told auditors from the Commissioner of Corporations, some months after the company was formed, that he was the president or the vice president, and he signed some checks as president and signed others in McCarty's name as vice president. He handled sales and negotiated for locations and operations, and he stated that he had "about all duties" and "did about everything that come along." Under all the evidence it seems clear that he had actual control and management of Zesto.

Weitz also controlled and operated through other persons the F. A. W. Sales Company. Most of its stock was issued in the name of McCarty and the balance in the name of Sloan, neither of whom invested any money in the corporation. Weitz also operated the Plains Distributing Company and the Plains Oil Company, which he testified were his own individual companies.

Zesto held an exclusive franchise from the Taylor Freezer Corporation, a nationwide manufacturer of automatic ice cream making machines, to sell the machines in several western states, including California. According to Weitz, the plan of Zesto was to sell a "package deal" to prospective operators of retail ice cream outlets, and he did most of the actual selling for Zesto. The "package" consisted of the lease or sublease from Zesto of a specially designed building at a satisfactory site, the sale and installation of one of the ice cream machines and related equipment, a license to use the machine for 10 years, and the sale of raw materials and other products as directed and supplied by Zesto. A person desiring to become a retailer made a down payment of about $2,500 on the purchase price of the equipment to be installed, the total price of which was about $11,000. In many instances he made an additional deposit, usually $1,500, for rental to be paid for the lot and the building. As will be discussed hereinafter, various promises, which were not kept, were made by Weitz on behalf of Zesto with respect to establishing stores or refunding the deposits. The corporation entered into from 100 to 200 preliminary agreements and accepted deposits thereunder. Total receipts of the corporation were over $500,000, but only 25 or 30 stores were built and equipped, and only five or six of the store buildings were constructed with funds supplied by Zesto. Although Weitz and Golding testified, and the books of Zesto showed, that over $65,000 was refunded to depositors, only a few instances of small refunds appear to be substantiated by other evidence.

In September 1950 the Taylor company cancelled Zesto's

franchise. At the end of that month Zesto signed a petition for reorganization under the bankruptcy laws of the United States, and the accompanying schedules stated that the assets were $98,461.56 and that the debts amounted to $201,133.75. In December a petition for involuntary bankruptcy was filed by Zesto's creditors, and it was declared bankrupt.

## GRAND THEFT

Weitz was convicted of grand theft under section 484 of the Penal Code. This section provides in part that any person who shall by "any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft."

The People contend that the convictions of grand theft may be supported upon the theory that the evidence shows that Weitz took money from prospective retailers with no intention to perform the promises which he made on behalf of Zesto.

We have recently held that a promise made with intent not to perform it is a "false or fraudulent representation or pretense" within the meaning of the statute. (*People* v. *Ashley, ante,* pp. 246, 262 [267 P.2d 271].) It was also pointed out there that in order to support a conviction in such a case "it must be shown that the defendant made a false pretense or a representation with intent to defraud the owner of his property, and that the owner was in fact defrauded. It is unnecessary to prove that the defendant benefited personally from the fraudulent acquisition. [Citation.] The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause. [Citation.] If the conviction rests primarily on the testimony of a single witness that the false pretense was made, the making of the pretense must be corroborated. (Pen. Code, § 1110.)"

The procedure of Weitz, in the sale negotiations, was to exhibit a sales kit which pictured in detail an ice cream store with its necessary equipment. The kit also contained a chart estimating probable profits and a copy of the standard operating agreement. Deposits made by prospective retailers were acknowledged by means of a uniform printed receipt which stated, in part, that Zesto would diligently endeavor to find a location and that the deposit money would be refunded if no suitable location was found within a specified time. From the evidence it appears that the usual transaction involved not only an express promise by Zesto to refund the deposits

if a suitable location was not found within the specified time, but also an implied promise, conditioned on the finding of such a location and the execution by the retailer of the standard operating agreement and the standard form of lease, that the necessary equipment would be delivered at that location and installed in a store building which Zesto would obtain and lease to the retailer.

The transactions involved in the ten counts of grand theft took place in the usual manner, and, in addition to the promises noted above, Weitz also orally promised five of the retailers that their stores would be ready within a specified time. Eight of the transactions were handled by Weitz personally and the remaining two by persons who acted under his direction. In each of the ten instances the promises to find locations and furnish stores and equipment were performed only partly or not at all, and none of the complainants received an ice cream machine. Further, no refunds were made in most of the ten transactions, and in the others there were only partial refunds.

There was evidence that there had been a very extensive "kiting" operation and that the money withheld from Zesto by this method "could be ten thousand or a hundred thousand" dollars. In a number of cases it appears that funds which came from retailers other than the persons named in the ten counts, and which actually belonged to Zesto, went instead to F.A.W. and were shown on the books of F.A.W. as having been received from McCarty for the purchase of stock and as having been disbursed by F.A.W. for the purchase of materials, such as automotive parts, from the Plains Distributing Company. F.A.W. checks made out to the Plains company for these purchases were endorsed by that company and by Weitz and then cashed. Some of these checks found their way into the books of Zesto and were shown as credits for the purchase of Zesto stock by Golding, Nelson or McCarty. As indicated above, however, McCarty bought no stock of either F.A.W. or Zesto.

By another operation termed a "parallel check transaction" about $4,000 of Zesto funds were transferred to F.A.W. and recorded on the books of that company as used for the purchase of its stock by McCarty. During the early months of 1949 two series of checks, identical as to dates and amounts, were drawn against the Zesto bank account, but only one set was listed in the Zesto books. In the first set each check was payable to a specific creditor, endorsed by the payee and collected. In the second set all checks were made to cash and

endorsed by Weitz. Most of them were deposited in the F.A.W. bank account, and the rest were cashed.

With respect to the amount of money transferred to F.A.W. by some such method, the records of that company showed total deposits of $58,968.84, which purported to include capital contributions of $49,000 by McCarty and $1,000 by Sloan who, as we have seen, did not personally contribute any money to that company. With two exceptions the entries relating to stock purchases by McCarty were "supported" by invoices showing that F.A.W. had purchased equipment from Plains Distributing Company.

In another transaction a check for $2,083 given as a deposit by a retailer was placed in the Plains Oil Company bank account, and Weitz then drew a check on this account for $2,000 which he deposited in an account kept by him and his wife in the name of his married daughter. Immediately thereafter he withdrew $1,976.50 from the latter account to pay for an automobile which he gave to his daughter. About two months later funds were placed in a Zesto account and were shown as having come from the retailer who made the deposit in question. Weitz stated that he had the money in his pocket all the time, but the jury could disbelieve him and conclude that it came from a subsequent deposit by another retailer.

There is evidence that fourteen subdistributorships were sold by Zesto for $1,500 each, and that, although the moneys belonged to Zesto, Weitz divided them with Nelson and Golding. In this connection he stated, "All corporation money I considered was ours and we split it." Weitz testified that he also received "kickbacks" of $500 each from the contractors who constructed six stores and that the money was "divided three ways."

In another instance a deposit of $7,718.66 placed in a Zesto bank account consisted entirely of checks drawn upon the Zesto company itself. A certified public accountant who examined the books testified that this constituted a way of building up "paper deposits" in the company, that the records would not reflect what actually took place and that he considered it a "deceptive practice." During other portions of his testimony the accountant characterized the books of Zesto as not complete, as inadequate, and as not showing what certain cash receipts or deposits were for. In certain instances "the receipts showed a different entry than what the actual deposit was for," and in a great many cases

checks were coded to one account but posted to another. Quite a number of the checks were missing. The accountant concluded that Weitz took money belonging to Zesto.

The evidence is clearly sufficient to permit the following inferences and conclusions: Weitz, from the inception of the Zesto corporation, engaged in various methods of diverting substantial funds of the corporation into cash which was not accounted for and was apparently used for purposes other than the benefit of the corporation, and the books were falsified in an attempt to cover up the diversions. Although the record does not show the exact time when the corporation actually became insolvent, it seems to have been in an unsatisfactory financial condition from the beginning. The $500 paid by Nelson for the first issue of five shares of stock to him is probably the only real capital contribution by a stockholder, since there is evidence that all of the remaining shares were indirectly paid for by money belonging to the company which came from deposit payments by retailers and subdistributors. There is no satisfactory explanation how sufficient profits could have come to the corporation from the operation of stores to offset the large diversions or enable the company to meet its growing obligations to retailers and creditors. The obligations increased as deposits were made, and the corporation was forced to cease operations entirely as soon as new deposits were shut off as a result of the termination of the Taylor company's franchise to Zesto. All but one of the deposits involved in the ten counts of grand theft were made during the last half of the company's operation, and the remaining deposit was accepted after a number of diversions had been made. The jury could conclude that Weitz then knew that the company could not succeed in view of the extensive diversions of funds for improper purposes. Even though the business might have succeeded if it had been honestly conducted, Weitz must have known from the beginning that it could not hope to succeed if substantial sums were wrongfully diverted. The fact that he nevertheless made diversions, coupled with the further fact that he falsified the books, justifies the implied finding that the promises to the ten complainants were made without intent to perform them.

Weitz contends that the evidence of his false pretenses was not corroborated as required by section 1110 of the Penal Code* which provides in substance that a defendant cannot

*Section 1110 of the Penal Code reads: ''Upon a trial for having, with an intent to cheat or defraud another designedly, by any false

be convicted of this type of grand theft unless the false pretense or a memorandum thereof is in writing subscribed by the defendant or unless the pretense is proved by the testimony of two witnesses or of one witness and corroborating circumstances. We need not determine whether the written receipt given to each of the ten complainants is a memorandum within the meaning of this section since the testimony of each victim as to the promises made by Weitz was corroborated by other victims who testified to similar dealings with him. (*People* v. *Ashley, ante,* pp. 246, 268 [267 P.2d 271]; *People* v. *Jones,* 36 Cal.2d 373, 378-379 [224 P.2d 353].)

Under all the circumstances, the evidence must be held sufficient to support the convictions under the ten counts of grand theft.

■ It is argued that the trial court erroneously admitted the testimony of various retailers whose dealings with Weitz and Zesto were not involved in the indictment. This testimony was to the effect that their deposits were not refunded and that they had not received stores or equipment. Inasmuch as the evidence related to transactions similar in material elements to the ones forming the basis of the indictment, it was admissible to show defendant's criminal intent and to corroborate the evidence of false pretenses. (*People* v. *Gordon,* 71 Cal.App.2d 606, 632 [163 P.2d 110]; *People* v. *Robinson,* 107 Cal.App. 211, 224 [290 P. 470]; *cf. People* v. *Jones,* 36 Cal.2d 373, 378-379 [224 P.2d 353].) ■ Nor can Weitz now complain that the jury was not instructed that the evidence was to be used only for a limited purpose, since he did not request such an instruction. (*People* v. *Northey,* 77 Cal. 618, 631 [19 P. 865, 20 P. 129]; *People* v. *Collins,* 48 Cal. 277, 279; *People* v. *James,* 40 Cal.App.2d 740, 746 [105 P.2d 947]; *cf. People* v. *Fowler,* 178 Cal. 657, 663 [174 P. 892].)

■ The court instructed the jury that it must determine which type of theft was committed and, in summarizing the

---

pretense, obtained the signature of any person to a written instrument, or having obtained from any person any labor, money, or property, whether real or personal, or valuable thing, the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; but this section does not apply to a prosecution for falsely representing or personating another, and, in such assumed character, marrying, or receiving any money or property.''

provisions of section 506 of the Penal Code, stated that misappropriation of money by various classes of persons, including an agent or "collector," would constitute embezzlement. Immediately thereafter the court gave an instruction which defined the word "collector" in the language of the second paragraph of section 506a.* Weitz does not complain of the giving of the first instruction which referred to a collector, but he argues that the second instruction which defined that term was inconsistent with the first one and therefore should not have been given. Although not entirely clear, his theory apparently is that the definition of "collector" contained in section 506a is broader than the meaning of the word as it is used in section 506 and would improperly permit the jury to treat appellant as one who can be guilty of embezzlement. The first paragraph of section 506a,† however, provides that any person who, "acting as collector," violates section 506, shall be deemed to be an "agent or person" as defined in section 506 and subject to prosecution in accordance with that section, and it is obvious that section 506a was intended to amplify and explain section 506, that the statutes are not inconsistent and that the legislative definition of "collector" in section 506a could properly be given to the jury in any case where an instruction on section 506 is appropriate.

## FORGERY

The next question is whether the evidence is sufficient to support the conviction of Weitz on the two counts of forgery. Each count charged Weitz and his wife with forging, uttering and passing a conditional sales contract with the in-

---

*The instruction reads as follows: The word collector herein set forth shall also include and be held to mean every such person who collects, or who has in his possession or under his control property or money for the use of any other person, whether in his own name or mixed with his own property or money, or otherwise, or whether he has any interest, direct or indirect, in or to such property or money, or any portion thereof, and who fraudulently appropriates to his own use, or the use of any person other than the true owner, or person entitled thereto, or secretes such property or money, or any portion thereof, or interest therein not his own, with a fraudulent intent to appropriate it to any use or purpose not in the due and lawful execution of his trust.

†The first paragraph of section 506a of the Penal Code provides: "Any person who, acting as collector, or acting in any capacity in or about a business conducted for the collection of accounts or debts owing by another person, and who violates the provisions of section five hundred six of the Penal Code, shall be deemed to be an agent or person as defined in said section five hundred six of the Penal Code, and subject for a violation of the provisions of said section five hundred six of the Penal Code, to be prosecuted, tried, and punished in accordance therewith and with law."

tent to defraud Zesto, its creditors and Fred A. Wertz, the brother of Mrs. Weitz. Section 470 of the Penal Code,* so far as relevant here, provides that a person is guilty of forgery if, with intent to defraud, he signs the name of another person to any contract knowing that he has no authority to do so or if he passes such a forged instrument as genuine with intent to defraud any person and with knowledge that it is forged. Under section 31 of the Penal Code† any person is a principal in a crime, although he does not directly commit the act constituting the offense, when he aids in its commission or, not being present, advises and encourages its commission.

The contracts upon which the two counts of forgery are based relate to a purported sale by Zesto to Wertz of the equipment in two Zesto stores. Weitz testified that the instruments were prepared by the office manager of Zesto and that they were signed by Mrs. Weitz with the name of Wertz. Someone connected with Zesto took one of the contracts to a bank and the other to a finance company, and they were assigned for a valuable consideration.

There is evidence that Weitz directed and handled all phases of the purported sale to Wertz. Weitz testified in detail as to what was done, and a memorandum of the transaction in his handwriting was found among the records of Zesto. He admitted that he fixed the sales price and furnished part of the cash that went into the transaction, but he claimed that it was a loan to Wertz. The office manager drew a bill of sale covering one of the two stores at the request of Weitz, who gave him a bank deposit receipt for checks placed in the corporation's bank account and told him that it represented a deposit for Wertz on that store. Both Weitz and his wife testified that Wertz gave her authority to sign his name to the contracts. Wertz, however, denied that he had given

*Section 470 of the Penal Code reads as follows: "Every person who, with intent to defraud, signs the name of another person, . . . knowing that he has no authority so to do, to any . . . contract, . . . or utters, publishes, passes, or attempts to pass, as true and genuine, any of the above-named false, altered, forged, or counterfeited matters, as above specified and described, knowing the same to be false, altered, forged, or counterfeited, with intent to prejudice, damage, or defraud any person; . . . is guilty of forgery."

†Section 31 of the Penal Code reads as follows: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed."

anyone authority to sign these contracts or anything else connected with Zesto. He further stated that Weitz attempted to obtain his signature on a conditional sales contract for one of the stores and that they had a conference with Wertz' attorney, but the contract was not signed. The evidence indicates that Weitz knew that his wife had no authority to sign the contracts for Wertz and that he nevertheless directed the entire transaction, including the unauthorized signing and passing of the instruments. ■ The signing of a person's name without authority, at least where the instrument has been uttered, is sufficient to imply an intent to defraud. (*People* v. *Horowitz*, 70 Cal.App.2d 675, 687 [161 P.2d 833]; *People* v. *Baender*, 68 Cal.App. 49, 59 [228 P. 536].)

■ Accordingly, although Weitz did not personally sign the instruments, it can be inferred, from the fact that he directed the entire transaction, that he acted with intent to defraud. ■ His assertion that no person was actually injured by the forgeries, even if true, presents no defense. (*People* v. *Turner*, 113 Cal. 278, 281 [45 P. 331]; *People* v. *West*, 34 Cal.App.2d 55, 60 [93 P.2d 153]; *People* v. *Kuhn*, 33 Cal.App. 319, 320 [165 P. 26].)

■ It is asserted that instructions by the court unduly emphasized the fact that one of the essential elements of forgery is knowingly signing the name of another without authorization. Instead of operating to the prejudice of defendant, however, the instructions would seem to have benefited him by stressing to the jury an element of the crime without which he could not be convicted and concerning which there was conflicting testimony. Moreover, the court cautioned the jury that no emphasis was intended by the court or to be inferred by the jury if the instructions stated any rule or idea in varying ways.

### Asserted Misconduct of the Prosecution

■ Weitz claims that the People were guilty of prejudicial misconduct in the *voir dire* examination of jurors. Twenty of the prospective jurors, including six who ultimately served on the jury, were asked whether they were members of the Seventh Day Adventist Church, and all answered that they were not. Weitz asserts that this questioning amounted to a violation of the right to free exercise and enjoyment of religious profession and worship. (Cal. Const., art. I, § 4.) The record, however, does not indicate what his religious affiliation might be, no religious issue was involved in the case, and it does not appear how he could have been prejudiced.

CORPORATE SECURITIES ACT

Weitz was also convicted under two counts which charged violations of subdivisions (a) and (b) of section 26104 of the Corporations Code. He makes no contentions with respect to these counts, however, and the evidence appears to be sufficient to support the convictions.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment insofar as it affirms the convictions on the two counts of forgery and the two counts of violation of the Corporate Securities Act.

As to the ten counts of grand theft, inasmuch as the majority see fit to rest their affirmance of conviction upon the recently innovated rule of *People* v. *Ashley* (1954), *ante,* p. 246 [267 P.2d 271], I dissent upon the grounds and for the reasons elaborated in the concurring and dissenting opinion in that case. Because it would serve no useful purpose here I do not consider or discuss the sufficiency of the evidence to support the convictions of grand theft without reliance upon the Ashley rule.

Carter, J., concurred.

Appellant's petition for a rehearing was denied March 25, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.