[Crim. No. 3544. First Dist., Div. One. Mar. 9, 1960.]

THE PEOPLE, Respondent, v. IRVING CARLIN et al., Appellants.

J. Bruce Fratis, Frank M. Brown and George Olshausen for Appellants.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, Arlo E. Smith and Edward P. O'Brien, Deputy Attorneys General, for Respondent.

DUNIWAY, J.—Three defendants appeal from judgments and orders denying their motions for new trial following verdicts of guilty on both counts of an information charging them with conspiracy to commit theft (Pen. Code, §§ 182, 484) and theft (Pen. Code, § 487) from one Frantzich. The specific offense was obtaining money by false pretenses. It is claimed that the evidence does not support the verdicts, that the court committed prejudicial error, and that the district attorney

was guilty of prejudicial misconduct. We find that the evidence is sufficient, and that the error or misconduct, if any, was not prejudicial. The reporter's transcript contains 1,219 pages; so we can set out only the more important testimony.

## The Facts

The facts, stated as they must be in the light most favorable to the verdicts, are as follows. Defendant Carlin developed a powder which, when added to orange juice or other juices, produces a tasty drink. He called the drink "Orange Suzie." In the years 1951 and 1952, he had some success in marketing it through stores or snack bars in the Los Angeles area, where he lived. His procedure was to set up and open a store, and then sell it to some person who would operate it, blending and selling the drink and purchasing the powder from a corporation organized in 1951 and called Orange Suzie of Southern California. It was owned one half by a man named Krasne and one half by Carlin, his wife and his son-in-law. Carlin also owned and operated a bowling alley, and in or after 1952 the Orange Suzie operation ceased because he could not devote enough time to both businesses. Apparently the powder continued to be sold to the stores that had been established.

In 1954, Carlin lost his bowling alley. In 1955, Krasne having dropped out of the picture, Carlin decided to reactivate Orange Suzie. He went to Texas and sold 12 pounds of the powder to a store in Houston, and about 1,000 pounds to a jobber there. However, 90 per cent of the 1,000 pounds was returned to him, and he did no further business in Texas. He also went to a food show in Chicago, where he demonstrated the drink but did no business. In 1951 or 1952 he sold one substantial order in Guam, but did no further business there.

In 1956, he decided to expand the business by selling distributorships in various parts of the country, and the name of the corporation, which he and his family then owned, was changed to Orange Suzie Company, Inc. It had no plant for the manufacture of the powder, and no tangible assets. Its "office" was Carlin's home. It had some advertising matter and it had a bank account with a branch of the Bank of America in Hollywood. The account was opened on February 23, 1955, with a deposit of $250. In 1956, the balances at the close of successive months were: May, $8.10; June, $7.78; July, $6.44; August, $10.82, and September, $1.04. The company had no distributors, no sales force, in fact, no personnel except Carlin. Its only other asset was the formula for Orange Suzie powder.

On September 9, 1956, Carlin placed an "ad" in the San Francisco Examiner reading: "Distributors—America's finest orange, pineapple and apple drink. Easy sales and big profits now. Orange Suzie Co., Inc., 811 Shenandoah, Los Angeles, Calif." He had run similar ads in San Diego and Los Angeles, but these were more glowing, as suits a sunnier clime. One Joseph Cardinali answered the San Francisco ad, but would not come to Los Angeles to see Carlin. So Carlin wrote him, on the 22d, that he would come to San Francisco "so that you will have a better understanding of this highly profitable business."

Shortly after September 22, Carlin met several times with the defendants Overman and Haas. Overman he had known slightly; Haas he met for the first time. Both had done some sales work, the precise nature of which is not described in the record. Carlin made no investigation of their background or experience. Their meetings lasted several hours on each of several days, and the purpose of the meetings was to discuss ways and means of promoting Orange Suzie. Each of the defendants testified as to what was said at these meetings, and their testimony, if believed, would indicate that no plot to obtain money by false pretenses was hatched. However, they did state that the whole operation was discussed, that Texas, Chicago, and Guam were mentioned, and that the advertising matter, of which more later, was reviewed. It was finally agreed that Overman and Haas would undertake to sell distributorships, and would receive a commission of 40 per cent of the sales price, plus an "override" of $1.00 per pound of powder sold to the distributor on reorders. The powder was to be sold to the distributor for $3.60 per pound, and he was to resell for $6.00 thus giving him a profit of $2.40 per pound. Carlin indicated that the minimum price for a distributorship was to be $1,250, for which the distributor would receive 10 blenders for mixing the drink, 100 pounds of powder, and 10 accounts. The accounts, which meant customers of the distributor, were to be obtained by the Orange Suzie Company. There is some conflict in the defendants' testimony as to the responsibility of Overman and Haas for obtaining the accounts. The agreement was reduced to writing.

Carlin told the others about Cardinali, and the two of them departed for San Francisco, armed with the advertising matter and a form contract, and "all the authority to perform a deal." Carlin remained at home. They met twice with Cardinali, on October 1 and 2, and offered him a distributor-

ship for $20,000. They said that at first he would only be making "five, six, eight hundred dollars a month, but within six months or a year" it would be "a great big business." Cardinali was told that Orange Suzie was "all over," in Illinois, New York, Texas, Guam, Florida, and several other places; that there were a lot of distributors; that one had bought his distributorship for $10,000 and in two months sold it for $30,000. For the $20,000, Cardinali was to get 200 blenders, 2,000 pounds of powder, and the distributorship for San Francisco and San Mateo Counties. He said he couldn't raise that much, and the salesmen then suggested $15,000 or $12,000. When asked if they would take a second deed of trust they said yes, and suggested $11,000 for 100 blenders, 500 pounds of powder, and the same territory, and said that a sales force would come up from Los Angeles and open 100 accounts. Cardinali was to buy the powder for $3.60 and sell at $6.00 per pound. He was shown the advertising matter that Carlin had supplied, and was told that, without working hard, he could make "forty, fifty thousand dollars a year."

The advertising matter refers to a "tremendous opportunity for financial independence," and describes Orange Suzie as "the most efficient specialty food and drink operation in the world." "Where there is traffic, there's sales—lots of sales— . . . Experience has proven this to franchise operators [there was only one franchise operator anywhere and he paid nothing for the franchise]. . . . We would hesitate to estimate figures as they would seem astronomical. . . . We arrange everything. . . . The nation's most popular drink . . . 'ORANGE SUZIE' From coast to coast. . . . We give the most." "This is an ideal business for many 'Ma and Pa' operation for markets, drug stores in fact anywheres there is traffic. This can be made very easily in San Francisco and a very big profit for you." There was also a chart of supposed profits. These were accompanied by statements by Overman and Haas that they had made a survey in San Francisco (which they had not) that about a thousand accounts could be opened immediately and more later, and that other distributors (there were none) were making big profits, up to $50,000 a year.

It developed that Cardinali could not raise even $11,000; so the salesmen promptly agreed to accept a second deed of trust for $5,500, provided that it could be sold quickly. Cardinali signed a contract, on October 2, 1956, on the form provided by Carlin. The contract recites that Cardinali "receives the following merchandise and consideration in full:

"1. 50 accounts in this territory

"2. 50 blenders for commercial use

"3. 500 lbs. of Orange Suzie." This is followed by a provision that "No other terms or conditions expressed or implied by any representative of the company shall be binding upon the Orange Suzie Company, Inc." The contract gave him an exclusive distributorship in San Francisco and San Mateo Counties. He was told that they would open the accounts within 30 days.

Cardinali's note for $5,500, secured by a second trust deed on an apartment house that he owned, was placed in escrow. The salesmen returned to Los Angeles and conferred with Carlin, who accepted the deal when told that the second trust deed could be cashed out promptly. This was done, and the net proceeds, about $4,600, were received in the middle of October and deposited in the company account. Overman and Haas were immediately paid their 40 per cent ($1,838). The balance did not stay in the company's account, but $2,450 of it went into an account in Mrs. Carlin's name, and on which she alone could draw. On October 6, Carlin, by letter welcomed Cardinali "into the family [there was none] of Orange Suzie Distributors. . . . Your merchandise will be on the way this coming week and our field men [there were none] will then work on the locations to get things started for you. You can rest assured that everything will be done to make San Francisco a very profitable situation . . ." At the end of October there was $114.34 in the company's account.

Overman and Haas had asked Cardinali whether he knew of anyone who could be a distributor for the East Bay. He did not, and an ad was then placed in the Oakland Tribune. One Ralph H. Frantzich responded and he, too, heard from and met with Overman and Haas, on October 26 and 29. They suggested that his territory be the Counties of Alameda and Contra Costa plus the city of Vallejo. They also told him that they had obtained a distributor in San Francisco, that the product was being distributed in the Los Angeles area, in the southern part of the state, in Guam, in Texas as a whole, and in Omaha, that there was a sales force in the Los Angeles area, part of which had been taken over by the man who had purchased the franchise for the whole state of Texas. He was told that they had not objected because the Texas man was doing such a good job and that he had taken three men, about 10 per cent of the sales force. It was represented that Frantzich's proposed territory had a potential of at least 1,100 ac-

counts, from a survey that they had made; that the cost of the material to him was $3.60 and selling price $6.00, and that the average account would handle over one pound a week, and that there would be a guarantee of 200 accounts "put in by them." Profit, to start, was stated to be $1,600 per month, gross. He was also shown Carlin's advertising matter. The sales crew was to start getting his accounts within two weeks. A price of $20,000 was suggested.

Frantzich signed the same form of contract as Cardinali, but at the $20,000 price. It was signed on October 29, 1956, and gave him the "exclusive distributorship" for the territory in question for "Orange Suzie Company, Inc. (Retail Stores division)." He was to get 200 blenders, 2,000 pounds of powder, and 200 accounts. He was told that the accounts would be installed within 60 days. He paid the $20,000, through a Bank of America escrow, on the same day, the check being released a few days later, when the powder was shipped to him. He received a letter of welcome, similar to that received by Cardinali.

Overman or Haas informed Carlin about the deal by phone, and he approved it. On the day that the check was deposited in the Orange Suzie account, Overman and Haas were each paid $4,000 commission,—the checks being marked "subject to clearance of Frantzich check." Carlin treated the remaining $12,000 as his own, withdrew it from the company account, and placed it in his wife's account. He spent it "on medical bills, living expenses, and in the business." This left $213.42 in the company account on November 7.

The balance of the testimony relates to events subsequent to the making of the Cardinali and Frantzich contracts and the payment of their money. It deals with the defendants' performance. Both of the victims received their blenders and the powder, which cost Carlin $13.50 per blender and about $1.25 per pound for powder. But each of the defendants admitted that without the promised accounts these items were worthless to the distributor. Efforts to obtain accounts for Cardinali were sketchy. Efforts to obtain them for Frantzich were substantially nil, though there was much reassuring talk and correspondence with both, some of which also contained rosy reassurances plus some direct misstatements of fact. A woman was first hired by Overman and Haas to work in San Francisco. She was on the job a week, got one account for Cardinali, and was fired by Carlin, who disapproved of the amount the salesman had agreed to pay her. The account

never reordered. She cost Carlin $125. He then picked up a pitchman for a reducing chewing gum at a five and ten cent store, to solicit accounts at $10 each, advanced about $130 to him, and got no results. He then got one Wilde into the act on the same $10 per account basis, again without results. Wilde told Carlin that he would have to advertise because the product was unknown in this area, but he refused to do so. The jury could find, if it chose to believe Carlin, that he spent from $500 to $700 in trying to get accounts for Cardinali. Overman and Haas dropped out of the picture, disclaiming any further responsibility, on November 7 or 8, when Carlin fired the woman whom they had hired. Carlin sold 10 pounds of powder at the Fairmont Hotel, but Cardinali got no reorders. In substance, then, neither distributor ever got the promised accounts. Frantzich rescinded on December 11, having obtained no accounts and nothing having been done to obtain any for him. He got back none of his money.

We think that the evidence clearly supports the verdicts. There were many false representations of fact made to Frantzich by Overman and Haas, and the jury was entitled to infer that Carlin had authorized the sort of sales pitch that they used. Carlin's advertising matter was anything but a model of veracity. Moreover, each defendant could readily be found to have made promises without any intention of performing them, as to the accounts. It is vigorously urged, especially on behalf of Carlin, that they acted in good faith, believing that a distributorship was worth the prices charged, and that their inability to obtain the promised accounts, while clearly a breach of contract, is not evidence of an intent not to perform when the promise to provide the accounts was made. This is a possible view of the evidence, but not, in our opinion, a persuasive one. Indeed, in view of the condition of the company and its business, the disposition made of the moneys received, and the way in which the price was tailored to the victim's ability to pay, defendants' protestations of innocent good faith are well nigh incredible. The record does not indicate that the defendants were skilled professional confidence men. They left too many tracks. But it does indicate that they were enthusiastic and quite successful amateurs. They took in and split, in less than a month, some $25,000, and from only two victims! They—and particularly Carlin— were either knaves or fools. It was for the jury to decide which, and we are convinced, after a careful review of the entire record, that the jury correctly decided that they were

714

knaves. The weight of the evidence seems clearly to be on that side.

■ It is settled that a conviction of grand theft by false pretenses can rest either on fraudulent statements of a factual character (*People* v. *Martin*, 153 Cal.App.2d 275, 285 [314 P.2d 493]) or on a promise made without intent to perform it (*People* v. *Ashley*, 42 Cal.2d 246, 259-265 [267 P.2d 271]; *People* v. *Weitz*, 42 Cal.2d 338, 343 [267 P.2d 295]). ■ The evidence as to the Cardinali transactions was properly admitted to show scheme and design and fraudulent intent on the part of the defendants. (*People* v. *Weitz, supra*, 42 Cal.2d 338, 347.) It also served to provide the corroboration required by Penal Code, section 1110. (*People* v. *Ashley, People* v. *Weitz, supra*.) ■ "Where a party offers to sell an interest in a business which has not been established and paints a rosy picture of its future based on false statements which the prospective purchaser believes to be true, the fraud is complete." (*People* v. *Davis*, 112 Cal.App.2d 286, 299 [246 P.2d 160].)

CLAIMED ERROR OF THE COURT

■ It is claimed that the court committed prejudicial misconduct in its cross-examination of Overman. This occurred after a fairly long and detailed cross-examination by the district attorney. The questions and answers and counsel's objections fill about 10 pages of the transcript. The only substantial objection made by counsel during the examination was the following:

"THE COURT: Now, you told Mr. Dean the conversation you had with Mr. Cardinali to induce him to take a second mortgage on his apartment house and use the proceeds of that to pay for this distributorship. Now, will you please tell us what you told him, to induce him to do that.

"MR. BROWN [counsel for Overman]: Now, Your Honor, I'm going to have to object to that, because I don't think the testimony is that he 'induced' him to take the money—to take a Second Deed of Trust.

"THE COURT: 'Induced him to pay for the distributorship.'

"MR. BROWN: The question——

"THE COURT: He sold it to him. I will change the question."

The court then, after further colloquy, changed the question to read: "What did you tell Mr. Cardinali, as a result of which he took a Second Mortgage on his apartment house and paid for this distributorship? Just what sales talk? Tell us what you told him and his wife."

The question as originally framed was not improper—the

evidence clearly shows that Overman and Haas did indeed "induce" Cardinali to buy the distributorship, and it was in order to buy it that he put the second trust deed on his property.

But counsel's real complaint is that the court went over the same ground as had already been covered, and did it by asking questions that were so framed, and were asked in such a manner, as to indicate to the jury that the court did not believe Overman. All counsel met in chambers with the court, and moved for a mistrial. The court denied the motions, stating that he thought that the witness had, indeed, been less than frank. He then admonished the jury not "to. draw any deductions or attach any particular significance to the fact that the Court has asked the witness any questions. . . . The Court only asked questions in an endeavor to draw out the facts and assist the jury . . . And in questioning or cross-examining the witness, the Court doesn't pass upon the credibility of a witness or upon the weight of his testimony. . . . [N]o significance should be attached to the fact that the Court asked the questions." The court had similarly cross-examined Carlin the day before, and had then given a similar instruction. No error is claimed as to that incident, although the questioning appears from the record to be equally sharp. The court did not err; on the contrary, it was performing a duty and exercising an authority frequently recognized by the courts. (*People* v. *Golsh,* 63 Cal.App. 609, 614-615 [219 P. 456]; *People* v. *Butterfield,* 40 Cal.App.2d 725, 731-732 [105 P.2d 628]; *People* v. *Lancellotti,* 147 Cal. App.2d 723, 729-731 [305 P.2d 926]; *People* v. *Ashley, supra,* 42 Cal.2d 246, 274.)

*People* v. *Hooper,* 92 Cal.App.2d 524, 528 [207 P.2d 117]; *People* v. *Burns,* 109 Cal.App.2d 524, 542-552 [241 P.2d 308, 242 P.2d 9], and *People* v. *Huff,* 134 Cal.App.2d 182 [285 P.2d 17], do not assist these appellants. In those cases the court clearly went beyond proper judicial conduct.

CLAIMED MISCONDUCT OF THE DISTRICT ATTORNEY

1. *Overman's conviction of a felony.*

When the defendant Overman was turned over to the district attorney for cross-examination, the following occurred: "Q. Now, Mr. Overman, have you ever been convicted of a felony? A: Mr. Dean—— Q: Just answer the question. A: Well, I don't know, Mr. Dean. About twenty-five years ago, I had a $10 counterfeit bill in my pocket and I received probation. Now, I don't know whether that was a

felony or not. Q: You plead guilty to passing a $10 bill in the Federal Court, Bay City, Michigan? A: That is right. Q: In 1934, a felony, isn't that correct? A: I don't know if it was a felony or not, Mr. Dean; it could have been.'' No objection was made, nor any claim of misconduct, nor was there any. (Code Civ. Proc., § 2051.) The witness himself volunteered information as to the nature of the offense, and it was, in fact a felony. (18 U.S.C. § 472; 18 U.S.C. § 1; *People v. Theodore*, 121 Cal.App.2d 17, 27-30 [262 P.2d 630].) The fact that counsel did not, at the time, object, indicates that they, too, thought that the questions were proper.

2. *Cross-examination of defendant Haas.*

 On direct examination Haas, in confirming Overman's testimony as to the steps the two salesmen had taken to investigate Carlin and his product before agreeing to work for him, stated that Carlin had mentioned that they might contact the Better Business Bureau if they wished. Haas testified somewhat later : ''A: Mr. Overman talked to someone, an official in the Better Business Bureau in Los Angeles. He asked about the Orange Suzie account and Mr. Carlin. The official said that, as far as he knew, that there has been no recent complaint at all, against Mr. Carlin or Orange Suzie; that the only thing the record showed, that it was approximately three years ago, prior to this time, that a salesman who had worked for Orange Suzie, had set up an account somewhere, had not sent in the money to Orange Suzie and that because of this there was a mixup on delivery of merchandise. But, as far as Mr. Carlin and the company was concerned, they were not to blame. This was, to the best of my knowledge, what the conversation was I got from Mr. Overman and this official of the Better Business Bureau.''

On cross-examination by the district attorney, the following occurred: ''Mr. Dean . . . Q: . . . After Mr. Overman talked to the Better Business Bureau, didn't he tell you that in that conversation the Better Business Bureau had informed him that several salesmen connected with Mr. Carlin two years previously had criminal records?

''Mr. Brown : Well, now, Your Honor, I'm going to object to that and assign it as misconduct upon the part of the prosecutor. It has no bearing upon the issue in this case, at all, as to whether two men who were employed by the company had criminal records. There is no showing Mr. Carlin knew about that at the time they were employed and it is highly prejudicial and I think it is misconduct.

"THE COURT: Also, the Defendant would not have the records when he employed them. I think the objection is good.

"MR. DEAN. Q: Was there any conversation with Mr. Carlin relative to Frank Osborne and E. J. Wertheim (spelling) W-e-r-t-h-e-i-m?

"A: Not that I recall. Q: You don't recall? A: No, sir."

After a good deal of further questioning on other subjects, a recess was taken, and the court and counsel retired to the judge's chambers, where appellants moved for a mistrial because of the above questioning. The motion was denied by the judge, who mentioned that no request had been made to admonish the jury, although he would have done so if requested, and that he would treat the motion for mistrial as a request to admonish the jury. However, the judge stated that, although he wanted to admonish the jury, he would first want the consent of appellants' counsel, because he feared that admonishing would accentuate the matter, and he had no desire to add fuel to the flames. The judge then said that he considered that certain cases imposed the duty of admonition upon the trial court, and he would heed this duty unless defense counsel excused him from so doing. Appellants' counsel, who had stated that they felt the prejudice could not be cured by admonition, left the matter to the court's discretion. The judge then told them that he felt the question was asked by the district attorney in good faith, and that no harm would come from the admonition. When the court reconvened, the judge advised the jury as follows: "THE COURT: . . . shortly before the recess, the District Attorney asked this question of the witness as to the records of certain employees that had been hired by the Orange Suzie Company. An objection was sustained by the Court to that question and while the Court will instruct you on the matter of the significance of objections and motions to strike testimony, I feel at this time I should specifically advise you that you should not draw any inference or attach any significance to the question of the District Attorney, and dismiss the entire matter and subject matter of that question from your mind, the same as if the question had not been asked."

Appellants Overman and Haas sought to put themselves in a favorable light because of their investigation of Carlin. It was to offset the effect of this "whitewashing" testimony and to impeach Haas that the prosecution asked the question, which was not directed at whether Carlin knowingly employed salesmen with criminal records, but at whether Haas and

Overman had been informed of the fact that men with criminal records had been employed.

Haas and Overman tried to give the impression that the Better Business Bureau had stated that the only thing shown by the record was a mix-up in delivery, occasioned by an absconding employee. The fact that they had learned that several salesmen previously connected with Carlin had criminal records would certainly weaken if not contradict the direct testimony. And, in contradicting their attempt to show good faith, the evidence was relevant to the question of whether Haas and Overman, learning of these men, checked further to assure themselves that Carlin was not knowingly connected. ■■■ Cross-examination of a defendant may be directed at eliciting any matter which may tend to overcome or qualify the effect of his direct testimony. (Pen. Code, § 1323; *People* v. *Kynette*, 15 Cal.2d 731, 753 [104 P.2d 794]; *People* v. *Buckley*, 143 Cal. 375, 388 [77 P. 169]; *People* v. *Zammora*, 66 Cal.App.2d 166, 213-214 [152 P.2d 180].) When parts of the conversation relating to the investigation were elicited on direct examination, the rest of the conversation bearing on the same subject could properly be developed on cross-examination. (Code Civ. Proc., § 1854.) ■■■ Counsel cannot bring out favorable parts of a conversation and then preclude his opponent from developing on cross-examination the unfavorable parts. The court, however, sustained the objection and terminated the inquiry. This was greater protection than that to which defendants were entitled.

3. *Misrepresentation of the meaning of the word "receives" in the distributorship contracts.*

■■■ Both Frantzich and Cardinali testified that each knew, when he signed the contract, that while the contracts recited that the distributor "receives" a certain number of accounts, the accounts did not in fact exist, and were to be supplied in the future. Nevertheless, the district attorney in his opening argument pointed out that the contract of Cardinali provided that the distributor "receives" 50 accounts, stressing the word by spelling it out, and that the contract provided that only those representations contained therein were binding and that any modification of the contract must be in writing. He went on to state: "Now, you recall we had all of this testimony about two weeks, three months, six weeks, when these accounts were to be put in, yet this very agreement right here specifies that this agreement is the full agreement and it can only be modified in writing and no terms or condi-

tions expressed or implied by any representative of the company shall be binding upon Orange Suzie Company, Inc.'' At this point he was interrupted by counsel for Overman, who stated that the prosecutor was representing to the jury that the agreement provided that the accounts should be in existence at the time the contract was signed, when it was clear from Mr. Frantzich and Mr. Cardinali that they did not expect the accounts until later. The court replied: ''He is arguing from an Exhibit that is in evidence. His argument is proper.'' Later the prosecutor asserted that Frantzich had testified that the 200 accounts would be secured on the signing or after the signing of the agreement, and that ''Mr. Haas, Mr. Overman testified both Mr. Frantzich and Mr. Cardinali knew that these accounts were not in existence but the agreements which were signed make no such reference.''

Appellants urge that this argument by the prosecutor amounted to prejudicial misconduct. We find none. The prosecutor was merely comparing the written agreement with the oral representations and promises, the purpose being to show that the agreement was artfully drawn to be a refuge for defendants in time of peril. This was a legitimate argument.

4. *Claimed assertion by the prosecutor of belief in defendants' guilt.*

In his argument to the jury counsel for Overman stated: ''MR. BROWN: . . . If you recall, the original investigation started on December the 7th of 1956. . . . The investigation starts in December, ladies and gentlemen, and the arrest is made in May. Why this long delay? What was the reason that it took them four months to decide this thing was so clear, if these men are such confidence men, why did they have to wait for months before they made this arrest?

''Well, I think you can add up a few factors in here and see. You know, ladies and gentlemen, that at or about the same time this inquiry was made at the District Attorney's office, around the 7th, that the notice of rescission of the contract by Frantzich was prepared around that time and that Mr. Frantzich admitted that he saw his attorney with respect to this investment, this money at that time.

''And at the same time, the District Attorney is brought into play. Investigation is made of the thing, men are called in, they talked to the investigator from Los Angeles, they talked to Mr. Reznik and they talked to Mr. Acton [of the San Francisco District Attorney's office]. They talked to every-

body, but no, we don't have the complaint until May. Why? "I think there is a reasonable inference that what was happening here was the civil situation was controlling and because these men took the position that no money was owed, that these men moved forward and, this is important, ladies and gentlemen, that when you consider the motive for the testimony of these complaining witnesses, you can take into consideration the fact that they had money invested in this transaction."

In the closing argument of the prosecution, the following transpired: "MR. DEAN: Mr. Brown makes an issue of the point that after this December meeting, no warrant was issued until May, 1957 . . . Mr. Brown doesn't mention that there may be reasons for delay, such as the Defendants asking for a delay or being inconvenienced at the time set for hearing. He never mentioned that possibility.

"But, there was a thorough investigation made, you can be sure of that, before any warrant was issued on May 2nd, 1956 [sic].

"THE COURT: I think the jury should be advised, Mr. Dean, and Counsel, that they will decide the case solely upon the evidence that has been introduced here in court and without any speculation as to what the investigation conducted by the District Attorney might or might not have uncovered. I think that should be clear and I think you intended nothing but that."

About three pages later in the transcript appears the following: "MR. DEAN: . . . The District Attorney's office is not trying to convict now, or any other time, an innocent person. And, if any of you, by any chance, got the impression that we were in this trial trying to convict an innocent person, I would like to——

"MR. FRATIS [counsel for Carlin]: Just a moment, Your Honor. I am going to object to this line of argument. . . .

"THE COURT: Yes, Mr. Dean, I don't think you should express your opinion as to the innocence or guilt of the Defendants. Your opinion is no more——

"MR. DEAN: I withdraw it.

"THE COURT: ——than Counsel for the Defendant and, as I told the jury before, they will decide this case solely on the evidence introduced in the case, and the Exhibits, and apply that evidence in the light of instructions of the Court and the opinion of the District Attorney is of no moment and I wish it would not be expressed."

Appellants assert prejudicial misconduct, relying upon

*People* v. *Edgar,* 34 Cal.App. 459 [167 P. 891], *People* v. *Beal,* 116 Cal.App.2d 475 [254 P.2d 100], *People* v. *Simms,* 144 Cal.App.2d 189 [300 P.2d 898], and *People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]. In *Edgar,* the district attorney was guilty of flagrant misconduct on numerous occasions throughout the trial, and in his closing argument asserted his belief in the guilt of the defendant in the strongest and most vituperative terms. This was in a case in which the defendant was charged with rape, upon the uncorroborated testimony of the complaining witness, which the upper court found so improbable as to run ''close to the border line of the fantastic.'' (P. 461 of 34 Cal.App.) *Beal* was also a rape case, in which the prosecutor made a dramatic and oratorical statement of his belief in the defendant's guilt, including a flat assertion that he had other evidence that he could not bring before the jury, and the court refused to admonish him or instruct the jury to disregard it. The appellate court felt that the evidence, while sufficient, was weak, and proceeded to demonstrate how weak it was. The Simms case was one of false pretenses, but the evidence was much weaker than in the present case, and the defendant was acquitted on three of five similar counts. Moreover, the misconduct of counsel was flagrant, differing only in degree from that in *Beal,* and, in addition, the court's instructions to the jury were erroneous. Murder was the crime in *Kirkes,* and the evidence was wholly circumstantial and somewhat tenuous. The prosecutor made a fervent statement ''that in all sincerity I believe and I still believe and knew prior to the time that I became associated in this particular prosecution . . . that this particular Defendant was guilty. . . .'' (P. 722.) This followed a reference to his oath of office, and was in turn followed by a further assertion of the prosecutor's belief. There were also other serious errors, including inflammatory appeals to the passion and prejudice of the jury.

The case at bar is markedly different. The prosecutor's remarks were in part provoked by appellant's arguments; in both instances the court promptly and effectively intervened, and in the latter instance the prosecutor promptly withdrew the remark.

Counsel, both in their briefs and in oral argument, have very persuasively contended that the case is a close one, and that the atmosphere of the trial was one of showing the slickers from Los Angeles ·that they cannot come up to the Bay Area and rob our citizens and get away with it. We have carefully

examined the entire transcript, including the opening and closing arguments of counsel and the court's instructions, and we fail to find the suggested atmosphere. On the contrary, it appears to us that the court presided with firmness and fairness, and that the argument of the district attorney, taken as a whole, was factual to the point of being almost colorless. In short, we think that the defendants had a fair trial, that their rights were fully protected, and that the evidence preponderates heavily against them.

We are not to be understood as approving the district attorney's remarks. Such statements should never be condoned. But we cannot say, in the light of the whole record, of the court's prompt action and admonitions, and of the district attorney's withdrawing his statement, that the errors complained of, either singly or taken together, have resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Acuff,* 94 Cal.App.2d 551, 558-559 [211 P.2d 17]; *People* v. *Bigelow,* 165 Cal.App.2d 407, 417-418 [332 P.2d 162]; *People* v. *Le Beau,* 136 Cal.App.2d 69, 71 [288 P.2d 294].)

The trial court was in a position, on motion for new trial, to consider the atmosphere of the case, and his own manner of asking questions, as well as the probable effect of the district attorney's remarks. We are not. It is for this reason that much must be left to his decision when it comes to determining the possibly prejudicial effect of these matters. (*People* v. *Bell,* 138 Cal.App.2d 7, 14 [291 P.2d 150].) Here, the court denied a motion for new trial, and must, therefore, have determined that the claimed errors and misconduct were not prejudicial. We cannot, on this record, conclude "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Judgments and orders affirmed.

Bray, P. J., and Tobriner, J., concurred.

The petition of appellants Haas and Overman for a rehearing was denied March 30, 1960, and their petition for a hearing by the Supreme Court was denied April 26, 1960. A motion of appellants Haas and Overman to vacate the judgment of the trial court was denied by the District Court of Appeal on March 29, 1960, and their petition for a hearing by the Supreme Court on that motion was denied May 4, 1960.