[Crim. No. 6001.   In Bank.   May 10, 1957.]

THE PEOPLE, Respondent, v. FRANK CORRIGAN, Appellant.

Frank Corrigan, in pro. per., Robert W. Cole, Public Defender (Sacramento), William D. Heekin, Assistant Public Defender, and Ralph D. Drayton, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and G. A. Strader, Deputy Attorney General, for Respondent.

GIBSON, C. J.—A jury found defendant guilty of first degree robbery, and he has appealed from the judgment of conviction and the order denying a new trial.

The robbery occurred about 1:25 a.m. on May 1, 1955, in a Sacramento bar called the King of Clubs. It was committed by two men whose faces were masked by women's stockings, and the shorter of the men held a gun and wore gloves, an overcoat and a hat. One of the robbers was Frederick Ash, who was arrested on May 2 and pleaded guilty when he was made a codefendant in this case. Defendant, whose first name is Frank, knew Ash, and, on May 6, a man who identified himself as "Frank" sought to reach Ash by telephone at the house where Ash rented an apartment. The landlady told the caller that Ash was out of town. Again on May 8, a man identifying himself as "Frank" telephoned and asked for Ash. The landlady's son answered the call and immediately telephoned his mother, who was visiting friends. When she came home about 15 minutes later, there was another telephone call, which she answered, and the voice of the caller sounded like that of the man who had asked for Ash on May 6. Immediately after and "pursuant to" the telephone call, the landlady and a friend went to Ash's apartment and "got" a locked green box. It contained, among other items, two purses, a wallet, a pair of women's stockings, an overcoat, a hat and a gun.

The green box and its contents were turned over to the police and were introduced in evidence at the trial. The purses and the wallet were identified as property taken in the robbery, and the stockings were similar to those worn by the masked men. The overcoat and hat resembled the garments of the shorter robber, and the gun looked like the one which he used. Defendant's fingerprints were found on the gun, and an eyewitness to the robbery testified that defendant was approximately the size of the man with the gun.

James Duran, an ex-convict who was arrested with defendant in defendant's apartment on May 8, testified that, twice during that day, Edward Dillon, another ex-convict who was present in the apartment, left to make telephone calls and that, when Dillon returned from making the second call, he told defendant that Ash was in jail. According to Duran, defendant then said that the "heat was on" and that "I hope you guys got sense enough to get rid of that box because in the box was the stockings and the gun and these fingerprints were all over it."

Defendant took the stand and denied participating in the robbery. He claimed that, on the night in question, he did not see Ash and that he was in a night club called the Sapphire Club from shortly before 1 a.m. until about 2 a.m., except that, at 1:10 or 1:20, he went across the street to another night club for five or ten minutes. By way of explaining the fact that his fingerprints were on the gun used in the robbery, defendant stated that he handled the weapon while being questioned by the police. However, two officers who conducted the interrogation testified that defendant did not touch the gun when it was shown to him. The evidence is sufficient to support the verdict.

Defendant seeks to reverse the judgment, claiming that he was prejudiced by questions which the judge asked three defense witnesses and by a statement of the judge that he would order Ash, who was then in jail, to be brought into court if defendant wished to call him as a witness.

Rheba Boyd, a waitress at the Sapphire Club, testified that she had breakfast with defendant about 2 a.m. on the night of the robbery and that defendant had been in the club during the preceding hour and a half. In cross-examining the witness, the prosecutor asked why she had not previously given this information to the authorities, and she answered, "Well, why should I? . . . A lot of people had seen him there that night, and should they all come up to the Police Department and tell them?" In reply to further questions on the subject, she said that, although she knew that her information, if believed, would "clear" defendant, she did not "think of it that way," and that she knew that defendant could not have committed the crime but that she did not "do anything about it." The judge interrupted and questioned the witness as follows:

THE COURT: Let me ask you this. You became quite concerned there when you were asked why you didn't go to the

authorities and tell them. Why didn't you go to the authorities and tell them that you knew where Corrigan was that night? I don't want anything that a lot of other people saw him. They haven't come up and testified to it, but you have. Tell us why you didn't go. If you knew this man was innocent, why did you wait until today to tell this Court where he was charged or to tell the District Attorney or the Chief of Police? Why did you wait until today?

A. Well, actually this Jack Travis, this bartender I was going with, he didn't want me to get involved anyway or anything.

THE COURT: You mean that the bartender was the one? Who is Jack Travis?

A. The fellow I was going with.

THE COURT: Where is he? Does he know anything about this?

WITNESS: No.

THE COURT: Well, all right. Now tell me, why, if you knew that this man was innocent, if you knew he was innocent, why did you wait until today? Give me your answer. You say it was your friend?

WITNESS: Well, I thought if he needed me he would certainly get in touch with me.

THE COURT: Did anybody ever get in touch with you?

WITNESS: Mr. Cayocca [defendant's attorney] is the only one.

THE COURT: All right, then what happened? Why didn't you go after you talked to Mr. Cayocca?

WITNESS: He didn't suggest it.

THE COURT: Did he suggest that you don't go?

WITNESS: No, he did not.

THE COURT: Well, then what stopped you from going?

WITNESS: Actually, I don't—I don't know why. I didn't go. Just never occurred to me.

THE COURT: You are here today. Aren't you?

WITNESS: Yes.

THE COURT: And you are here under a subpoena; isn't that right?

WITNESS: Yes.

THE COURT: When did you get that subpoena?

WITNESS: About a week and a half ago.

THE COURT: All right. At that time you knew that you were going to be brought into Court, didn't you?

WITNESS: Yes.

THE COURT: Why didn't you then go to the District Attorney and tell him that you knew this man was innocent?

WITNESS: Well, I don't know why, I just figured that I would have to be here today and that's all there was to it; I mean I just didn't think any more about it.

THE COURT: You never thought any more about it?

WITNESS: No.

THE COURT: Is that it?

WITNESS: Yes.

THE COURT: Is that what you want to tell me?

WITNESS: Yes.

THE COURT: All right. Now then, who was this you said told you not to become involved in it?

WITNESS: This Jack Travis I was going with him, and he was just a little jealous of Frank [defendant], that's all.

THE COURT: All right. And for that reason Jack Travis told you not to go and tell about it; is that it?

WITNESS: Well, he didn't say not to, but he said if you are not careful, he said, you may get a subpoena; that's all.

THE COURT: You told me he was jealous of Frank?

WITNESS: He was.

THE COURT: And is that the reason you mean to tell me that because he was jealous of Frank, that you would let a man be convicted of a crime of robbery because this bartender told you not to go to the police?

WITNESS: He didn't tell me not to go.

THE COURT: Well, why didn't you go?

WITNESS: Judge, I don't know why I didn't go.

THE COURT: All right. All right.

█ The right of a trial judge to examine witnesses is not disputed. (*People* v. *Ottey*, 5 Cal.2d 714, 721 [56 P.2d 193] ; *People* v. *Mendez*, 193 Cal. 39, 46 [223 P. 65] ; *Bell* v. *Moloney*, 175 Cal. 366, 370-371 [165 P. 917] ; *People* v. *Candiotto*, 128 Cal.App.2d 347, 359-360 [275 P.2d 500] ; *People* v. *Deacon*, 117 Cal.App.2d 206, 209 [255 P.2d 98] ; *People* v. *Flores*, 113 Cal.App.2d 813, 818 [249 P.2d 66] ; *People* v. *Montgomery*, 47 Cal.App.2d 1, 18 [117 P.2d 437] ; *People* v. *Golsh*, 63 Cal. App. 609, 615 [219 P. 456].) Defendant argues, however, that, in questioning the witness, the judge improperly led the jury to infer that her testimony was not to be believed because she did not volunteer to give to the authorities the information which she claimed to have with respect to defendant's whereabouts on the night the crime was committed. No objection was made to the questions asked of the witness by the

judge, nor did defendant make a motion to strike the questions or answers. █ It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred. (*People* v. *Ottey,* 5 Cal.2d 714, 721 [56 P.2d 193]; *People* v. *Bishop,* 134 Cal. 682, 686 [66 P. 976]; *People* v. *Deacon,* 117 Cal.App.2d 206, 208 [255 P.2d 98]; *People* v. *Flores,* 113 Cal.App.2d 813, 817 [249 P.2d 66]; *cf. People* v. *Amaya,* 40 Cal.2d 70, 78 [251 P.2d 324]; *People* v. *Avery,* 35 Cal.2d 487, 493 [218 P.2d 527].) If the rule were otherwise, a party could speculate on the verdict by deliberately failing to call the court's attention to a matter which could be remedied during the trial. We must assume that, had an objection been made, the judge would then have informed the jury that his purpose in so questioning the witness was to establish facts which might affect her credibility, but that it was the exclusive province of the jury to determine the credibility of the witness and the weight to be given her testimony. Such an instruction, given at the time the questions were asked, would have removed any danger that the jury might misunderstand the purpose of the examination. In this connection, it may be noted that the jury was instructed at the close of the case that it was the exclusive judge of the weight, value and effect of the evidence and of the credibility of the witnesses.

Another of the witnesses whom the judge questioned was Nick Bakotich, who testified that he was with defendant between 10 p.m. and 2 a.m. on the night of the robbery. The prosecutor asked him a number of questions concerning what they did on that night and about other occasions when he had been with defendant. The judge interrupted the cross-examination and continued the same general line of questioning at considerable length. The following portions of the record illustrate the matters complained of with respect to the judge's examination of this witness:

THE COURT: What other nights did you spend with him?

THE WITNESS: Oh, a couple of other occasions I met him uptown.

THE COURT: Tell me the last night before the 30th.

THE WITNESS: I guess it might have been around three, four days before.

THE COURT: Might have been three or four days. Tell me the last time you were with him before the 30th. You ought to know. You say you were there. Where were you with him the last time before the 30th? And tell me how long you were with him that time and what you talked about?

THE WITNESS: I don't recall.

THE COURT: You don't know. You don't know, is that it? Do you know or don't you know?

THE WITNESS: No.

THE COURT: You don't know, is that right?

THE WITNESS: (Nodded affirmatively.)

The judge later questioned Bakotich about his claim that a third man had been with him and defendant on the night of the crime:

THE COURT: Let's talk about this third person. What was his name?

THE WITNESS: I don't know his name.

THE COURT: Don't you know his first name?

THE WITNESS: Might have been Freddy, I think. I am not too sure.

THE COURT: Might have been Freddy. Freddy Ash?

THE WITNESS: No.

THE COURT: It might have been Freddy. But you don't know whether it was Freddy Ash or not; is that right?

THE WITNESS: No, I don't know the guy.

THE COURT: Why do you say it might have been Freddy?

THE WITNESS: Well, I think it might have been his name. I don't know.

THE COURT: You were with him from 9:30 until 2:00 o'clock in the morning?

THE WITNESS: That's right.

THE COURT: Is that right? And you don't—didn't even know his name? Were you ever with him before?

THE WITNESS: No sir.

At another point, in response to a question by the judge as to the source of the money which Bakotich spent on the night of the robbery, the witness testified that his brother had given the money to him earlier that day. The judge said that the brother would be called to testify and that Bakotich should wait in the corridor until recalled to the stand. The brother did not testify, but Bakotich was recalled, and the prosecution resumed the cross-examination. The witness then testified that he wanted to change his testimony, that he had been trying to help defendant, that there was a chance that he was with defendant on the night of the robbery but that he was not sure, and that it was possible that it was some other night. On redirect examination it was established that, while Bakotich was waiting to be recalled to the stand, he was taken into the district attorney's office, where several men,

apparently detectives, talked to him about perjury. The judge examined Bakotich and inquired whether anyone had told him to change his "story." The witness gave a negative answer and testified that he had been told that giving false testimony would constitute perjury, a fact which he had not known previously. The judge then asked, "As I understand your testimony . . . up to that time you thought you could help Frank out; is that it?" The witness replied, "That's right."

The third witness, of whose examination defendant complains, was Michael Azzinaro, the bartender who was on duty at the Sapphire Club on the night in question. He testified that defendant left the club at 1:15 a.m., returned about 1:35, and stayed until closing time. When cross-examined about his testimony that defendant first left the club at 1:15, he said, "The reason I say that is because he said, 'I'll see you later,' and I just happened to notice the time." He was asked if he could recall other persons who were in the club that night, and he testified that one was named Harry but that he could not remember at what time that customer left. At this point, the judge interrupted and questioned the witness as follows:

THE COURT: Let me ask you this, whenever anybody goes out, says, "I will see you later," do you always look at the time to see what time they leave?

WITNESS: Well, not exactly, but thirty-four years as a bartender is a little experience, your Honor. . . .

THE COURT: All right. Now let me ask you this. How many other people left that night that you could tell us left at 1:00 o'clock, that you looked at the clock when they left?

WITNESS: I didn't look at the clock but I could tell you a few.

THE COURT: All right. But you did look at the clock when Corrigan left; is that it?

WITNESS: No, I didn't look at the clock.

THE COURT: Didn't you tell us you looked at the clock?

WITNESS: But at 1:00 o'clock I did look at the clock and I spaced the time as fifteen minutes.

THE COURT: I see. As the time that he left?

WITNESS: Yes, I would say that at the time he left I spaced it at fifteen minutes.

THE COURT: How did you happen to do that? Why did you do that with him any different than anyone else?

WITNESS: Well, I don't do it any different with anyone else, your Honor, it's just that I know the time some come in and some go out is all.

THE COURT: Now isn't it a fact, let me ask you this and let's you and I be on the square with each other.

WITNESS: Yes.

THE COURT: Do you definitely know what time Corrigan left there that night? Don't forget I want you to tell me the truth.

WITNESS: Well, I am telling you the truth to the best of my knowledge.

THE COURT: All right, and you say at 1:15.

WITNESS: Yes, I would say.

There is no claim that the questions asked of Bakotich and Azzinaro constituted improper cross-examination as far as the subject matter was concerned. The position of defendant is that the length of the examination by the judge and some of the language which he used conveyed to the jury the impression that he did not believe the witnesses. No objection was made to any of the questions, and, as we have seen, defendant cannot complain on appeal where, as here, any error could have been corrected, if a timely objection had been made. ▮▮ Moreover, we find no error in the questioning of these two witnesses. The judge was obviously seeking to elicit or clarify testimony on material points, and it is the right and the duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence. (*People* v. *Martinez,* 38 Cal.2d 556, 564 [241 P.2d 224]; *People* v. *Mendez,* 193 Cal. 39, 46 [223 P. 65].) ▮ The mere fact that the judge examined Bakotich at some length does not establish misconduct. (*People* v. *Montgomery,* 47 Cal.App.2d 1, 18 [117 P.2d 437].) ▮ Nor is there any merit in defendant's contention that the judge acted improperly in remarking to Azzinaro, ''Let's you and I be on the square with each other. . . . Don't forget I want you to tell me the truth.'' This remark was made while Azzinaro was being questioned regarding the time defendant left the Sapphire Club, and it seems clear that, in view of the witness' vague and inconsistent testimony on that point, the judge merely wished to emphasize that Azzinaro should weigh his answer carefully and be certain of its truth.

▮ Finally, it is argued that the defendant was prejudiced by the judge's offer to have Ash, who was then in jail, brought into court if defendant wished to call him as a witness. On direct examination, defendant testified, in effect, that he was not afraid of having Ash called as a witness because Ash's testimony, if truthful, would not harm defendant. During

cross-examination, the prosecutor asked, "And isn't it a fact, Mr. Corrigan, that the reason you are not afraid is that you know that Mr. Ash will get up there and say that you were not the man with him?" Defendant answered, "Why if he tells the truth, he will, sir." The following then occurred:

THE COURT: Do you want him [Ash] called as a witness?

THE WITNESS: That's up to my attorney, sir.

THE COURT: Well it's up to you, too, I am asking you now, do you want him? I will order him here.

THE WITNESS: I don't care, sir, either way.

THE COURT: If you want him, he is available. I will bring him here from prison if you want.

MR. CAYOCCA [defense counsel] : Well, your Honor ——

THE COURT: If you want him, he is available for you.

MR. CAYOCCA: Your Honor, from what has gone on before with some of these other fellows that testified, I have already advised Mr. Corrigan that I would not call Ash.

THE COURT: I don't understand what you mean by that. If you want him, I will order him here so he is available for you.

There is no reason for supposing that the judge intervened for any purpose other than to assure defendant that Ash would be produced at the trial if defendant desired his testimony, and it was not error for the court to give defendant this assurance.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

SCHAUER, J., Dissenting.—I do not agree that (p. 561 *supra*, italics added) "it is the right and the duty of a judge *to conduct a trial*" in the manner stated in the opinion or otherwise. *People* v. *Martinez* (1952), 38 Cal.2d 556, 564 [241 P.2d 224], quoting *People* v. *Mendez* (1924), 193 Cal. 39, 46 [223 P. 65], cited in the opinion, is not authority for the above quoted statement. The right or duty the Martinez case speaks of is "to so *supervise and regulate* the course of a trial that the truth shall be revealed in so far as it may be, within the established rules of evidence." (Italics added.) To "supervise and regulate the course of a trial" is quite a different thing from assuming to himself "conduct a trial." The latter practice should be disapproved and discouraged rather than approved and encouraged.

A vice of the practice depicted by the record is that, however proper may have been the motive of the trial judge,

the effect of his intervention must almost certainly have tended to deprive the defendant of a fair trial. It tended to deprive the defendant of a fair trial not merely because of the content and improper implications of some of the judge's questions and statements but because it must have appeared to the jury that the judge was throwing the prestige of his position to the support of the prosecution. Trial by jury means that issues of fact shall be resolved by the jury on the evidence under the law. On the record here, the influence of the judicial mien can well have been the deciding factor; such influence is not lawful evidence.

For the reasons indicated above, and on the grounds more completely related in the opinion of Mr. Justice Peek, dissenting in the District Court of Appeal (reported in (Cal. App.) 302 P.2d 371, 385), I would reverse the judgment.

CARTER, J.—I dissent.

I concur in the views expressed by Mr. Justice Schauer in his dissenting opinion and, in addition, adopt the pertinent portions of the dissenting opinion of Mr. Justice Peek of the District Court of Appeal (Cal.App.) 302 P.2d 371, 385.

". . . 'A trial judge is rigorously prohibited from actions or words having the effect of conveying to the jury his personal opinion as to the truth or falsity of any evidence. This rule should be strictly adhered to.' (*People* v. *O'Donnell,* 11 Cal.2d 666 [81 P.2d 939].) . . .

"From my reading of the transcript I cannot escape the conclusion that from the outset of the trial, by the persistent, aggressive and lengthy cross-examination of the witnesses, the context of the questions asked, the innuendoes contained therein, as well as the inferences to be drawn therefrom, and what amounted to voluntary comments contained in such questions, the trial judge definitely stepped out of his character as a judge and took over the role of the prosecutor. And, by such actions and words, he very forcefully conveyed to the jury his personal opinion as to the truth or falsity of the evidence and the credibility of the witnesses. Although the majority opinion has quoted much of the extensive and repetitious examination of the witnesses by the court, it seems to me that only by a reading of the entire transcript can the true effect on the jury of such questioning be evaluated. . . . [T]he interrogation by the court, in addition to the portions quoted in the majority opinion, is replete with such comments and questions as:

" '. . . You ought to know. You say you were there . . . You don't know. You don't know, is that it? Do you know or don't you know? What joint were you in . . . you say . . . You guess . . . Now you are telling us. Is that right? And you don't—didn't even know his name . . .? Might have been Freddy but you don't know whether it was Freddy or not, is that right? You just guess it was during April; is that right? You are not sure are you? Are you sure it was in April or you just say it must have been, you guess? . . . All right, now let me ask you this . . . You don't remember that very well? You don't know the date. Was it Saturday night, Sunday night, or do you know? Have you any idea? . . . Who said? They said? Who are they?' . . .

"I cannot agree that the case was strong. The evidence concerning the identification of the two persons who participated in the robbery was entirely circumstantial. The testimony of the bartender and the four bar patrons, some of whom had been at the bar for quite some time, was in complete confusion. Their only agreement was as to what clothing was worn by the two men; that is, the nylon stockings worn as masks, the overcoat, hat and gloves, and the similarity of the gun used with the one introduced at the trial. The defendant herein was never directly identified. His only connection with the robbery was established by reason of the fingerprints being found on the gun and certain conflicting statements made by two of the State's witnesses concerning comments said to have been made by defendant following two telephone calls to Ash's landlady. The landlady testified to one version and one of the paroled ex-convicts testified to another, and one which was different from his testimony at the preliminary hearing. Duran, the other ex-convict parolee who was called by the prosecution gave still another version. Again there was conflict as to whether it was Dillon or Corrigan who made statements such as: that the 'heat was on' when he was informed that Ash was in jail; that he hoped that Ash had enough sense to do something with the box the police were said to have found; that there were stockings, gloves and other stuff in the box and fingerprints all over it. Corrigan denied that it was he who made such statements. But even assuming that he did, I do not consider such comment can be interpreted either as an admission on his part of participation in the robbery or as an identification of the gun. No incriminating evidence was found in the possession of Corrigan. The box was found in the attic of Ash's apartment. The fingerprints

found on the gun were not so placed as they would have been had the gun been held in a normal position. It was Corrigan's testimony that his fingerprints were left on the gun when he was asked to examine it at the police station. All of the witnesses testified that the robber who held the gun wore gloves at the time of the robbery. Thus the fingerprints must have been placed on the gun either before or after the robbery. The most that was said concerning the gun, by any of the witnesses, was merely that it was similar to the gun used at the time of the robbery.

''. . . a trial is not a game in which the judge can only act as an umpire, and 'sit quietly by and see one wrongfully acquitted or unjustly punished.' (*People* v. *Golsh,* 63 Cal. App. 609, 614-615 [219 P. 456].) But it is equally true that he must not become a partisan advocate. Therefore when, during the examination of the witnesses, a court by words or actions departs from the role of an impartial judge and conveys to the jury 'his personal opinion as to the truth or falsity of any evidence' (11 Cal.2d 666, 671) and it could well be added, of the credibility of any witness, he has by so doing placed himself without the bounds of article VI, section 19.

''No one will deny that jurors are most sensitive to and rely with great confidences on the fairness of judges and the correctness of their views expressed during the course of a trial. 'For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against a defendant.' (*People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607] ; *People* v. *O'Donnell,* 11 Cal.2d 666 [81 P.2d 939].)

''Conviction or acquittal may equally be the result of a miscarriage of justice. In either event a fundamental right of the People or of the defendant has been disregarded or denied. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging both to the People and the defendant shall be respected. (*People* v. *Long,* 63 Cal.App.2d 679 [147 P.2d 659].)

''The situation as presented by the record before this court . . . convinces me that to approve the . . . error in this case is to deny a fair, impartial trial to the defendant and to extend the saving grace of section 4½ just a bit too far.''

I would reverse the judgment and grant defendant a new trial.