[Crim. No. 8191. Second Dist., Div. One. Dec. 23, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. H. GAEL BALDWIN et al., Defendants and Appellants.

H. Gael Baldwin and Catalina Baldwin, in pro. per., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—By an information filed January 4, 1961, both defendants were charged in Count I with a violation of section 26104, subdivision (a), Corporations Code (selling a security without a permit) and in Counts III and IV with grand theft; defendant H. Gael Baldwin alone was charged with grand theft in Count II. After a trial by jury defendant H. Gael Baldwin (hereinafter referred to as "Gael") was found guilty on all four counts and defendant Catalina Baldwin (hereinafter referred to as "Catalina") was found guilty on Counts III and IV (i.e., found not guilty on Count I). Each defendant's motion for new trial was denied and each was sentenced to the state prison, the sentences on the several counts to run concurrently. Defendants appeal from the judgments of conviction.

A résumé of the facts set forth in the light most favorable to supporting the judgments is as follows:

*A. Facts Relative to Counts I and II:* [1]

Mr. Francis, a licensed land surveyor, was introduced to Gael and a meeting took place in April 1958 in Mr. Francis' office. Gael stated to Mr. Francis that he was a distributor of pipe lines in South America; that through the Peruvian government he was engaged in a project in Peru that would irrigate a large quantity of land; that he would need the services of a surveyor like Mr. Francis; that he had a corporation, Resources Incorporated; that his corporation would provide all the preliminary investigations for the Peruvian government; and that such investigations included the preparation of plans for the layout of a city, highways, access roads and freeways. The project was described to Mr. Francis as something that could be worked out from the ground up. Mr. Francis stated that such a project appealed to his interest as an investment of both his talents as well as money.

Subsequently, a conversation took place at the home of a third person. As a part of that conversation Gael stated to Mr. Francis that he had a $50,000 job for the Catholic Church and showed Mr. Francis a letter from the church with a seal on it, substantiating that Gael was to perform the construction work. Gael stated that he would need not only the services of Mr. Francis but other men for public administration, accounting and advertising; and that he particularly wanted Mr. Francis to do the survey work. When Gael asked Mr. Francis how much money he (Mr. Francis) could invest, Mr. Francis told him that he had $2,000; this sum was actually all of his savings; that he would invest this directly into the company so that he would have a stock interest in the

---

[1]Count 1 provides in pertinent part as follows:

". . . VIOLATION OF THE CORPORATE SECURITIES LAW, section 26104, subdivision (a), Corporations Code . . . [defendants] on or about the 22nd day of April, 1958, at and in the County of Los Angeles, State of California, did wilfully, unlawfully and feloniously sell and offer for sale and cause to be sold for value to Daniel D. Francis, a security, to wit, option to buy non-voting capital stock of Resources Corporation, a Lima, Peru, corporation formed for the purpose of conducting a business for profit, to wit, an engineering development and reclamation project, without first applying for and receiving from the Corporation Commissioner of the State of California a permit so to do."

Count II provides in pertinent part as follows:

". . . H. Gael Baldwin is accused . . . of the crime of GRAND THEFT . . . [in that] on or about the 22nd day of April, 1958 . . . [defendant] did wilfully, unlawfully and feloniously take two thousand and no/100 dollars ($2,000.00), in money . . . the personal property of Daniel D. Francis."

corporation. Gael said that he would give Mr. Francis $4,000 for the $2,000 he invested at the end of one year and, in addition, he promised Mr. Francis that he (Francis) would have a stock interest in the Resources Corporation in Peru, and could convert his $4,000 investment into stock in this corporation. Mr. Francis then gave Gael his check for $2,000; Gael gave Mr. Francis a note for $4,000, signed by both Gael and Catalina. A contract was drawn up embodying the terms of this agreement. The contract showed that the Resources Corporation was an established corporation in Peru, and the intention of Mr. Francis was to invest in that corporation.

Thereafter, Mr. Francis wrote to Gael several times and within a few months after the investment attempted to make contact with him. He could secure no reply. After the year was up, Mr. Francis concluded that he had been defrauded. He was not advised by defendants how he might contact them; he never received any of his money back; and he did not receive any stock in the Resources Corporation as had been agreed upon.

### B. Facts Relative to Count III:[2]

Mr. and Mrs. Aguilar saw defendants from time to time through 1956-1957. Later the Aguilars learned that defendants had gone to Peru. In June 1959 Catalina phoned the Aguilar residence and spoke to Mr. Aguilar. Catalina stated that defendants were up from Peru on very important and secret business. Mrs. Aguilar went to defendants' hotel and saw Catalina on the following Monday. Catalina told Mrs. Aguilar that defendants had been in the United States for some time but that the Aguilars were the first people they had seen socially; that they weren't really supposed to see anyone; that Gael permitted Catalina to telephone the Aguilars. Catalina was concerned that Mr. Aguilar was not working. She said that the Aguilars should go to South America with the defendants since the Aguilars were having such a miserable time in the United States. Catalina went on to say that defendants had struck it rich in South America; that they had become rich because they were truly honest; that

---

[2]Count III provides in pertinent part as follows:

". . . H. Gael Baldwin and Catalina Baldwin are accused . . . of the crime of Grand Theft in violation of section 487, subdivision 1, Penal Code . . . [in that defendants] on or about the 30th day of June, 1959 . . . did wilfully, unlawfully and feloniously take six thousand and no/100 Dollars ($6,000.00), in money . . . the personal property of Gabriel Aguilar and Nona May Linton Aguilar."

defendants were on a big project outside the City of Lima, Peru; that because Mr. Aguilar could speak Spanish fluently, defendants were interested in getting the Aguilars to work for the Catholic Church setting up universities, and in building a whole city outside of Lima, Peru. Catalina stated that defendants had just secured a big contract to be performed in Lima, Peru; that defendants had just barely started on the big project in Lima when they had received a phone call to come back to the United States immediately because there had been a uranium strike on certain land owned by defendants; that Mr. McCone of the Atomic Energy Commission wanted them to go to work in Nevada immediately at the same time that they were trying to work in Peru; that they really didn't have any ready cash at the moment because of their heavy investments in Lima, Peru, and now they were being called to Nevada where they would be rich and have a million dollar per month income from the combination of Lima, Peru, and Nevada; and finally that they hardly knew whether they were coming or going because, with hardly enough money to eat on, they were going to be rich in December.

Catalina stated further to Mrs. Aguilar that defendants were going to start a chain of hotels and they would need the services of Mr. Aguilar as manager. Also, that Mrs. Aguilar should go to Peru to assist defendants in trying to get artists and professors to start a cultural center in Lima.

After these conversations Mrs. Aguilar wrote Catalina a brief letter stating that, although her husband was temporarily unemployed, he had just sold some property, the proceeds of which they were to live on during the summer and, although they would be desperately up against it at the end of the summer, if the defendants wished to live on the Aguilar's resources for the summer they offered $500 to the defendants.

Catalina had separate conversations with Mr. Aguilar in which she stated that she was very interested in Mr. Aguilar's efforts at selling the Harvard Classics; that she would like to buy two sets as soon as possible. Mr. Aguilar told her that this would amount to some $750, and Catalina replied that this meant nothing because they were going to be rich; that in Peru they had been bidding for a big contract against a ruthless rich man; that the defendants had been honest and had not offered bribes. That defendants had sold everything they had in order to get the money needed to secure the

contract, and had finally gotten the contract; that it was now worth fifty million dollars. Then only 15 days after they had scraped together the money for this contract they got a telegram from the Atomic Energy Commission in Washington stating that uranium had been discovered upon land defendants owned in Nevada; that this was the richest uranium in the United States; and that it would be somewhere in the neighborhood of five hundred million dollars. Gael came in during these conversations and said that he had a report from his engineers on the mine in Nevada and that the report confirmed everything that Catalina had said; that in addition to uranium there would be a byproduct of gold from the mine that would yield about $300 a day at peak production. Gael then showed Mr. Aguilar a picture of the location of the mine, plans of the mine, and places where they would make a strat graphical cut into a hill to find the concentrations of the ore. Gael also showed Mr. Aguilar papers demonstrating that he had entire charge of construction programs in Lima, Peru, for the Franciscan, Dominican and Jesuit Orders in Lima.

Gael stated to Mr. Aguilar that defendants were planning to construct a city outside of Lima and set up a string of hotels all over South America; that defendants were in possession of a unique Geiger counter that discovered uranium in their mine from a distance of 5 miles and that it was almost foolproof in the discovery of oil; that defendants wanted the Aguilars to come to Peru with them and that they wanted to make the Aguilars millionaires.

Catalina further told Mr. Aguilar that defendants were not selling stock in the company that they were setting up for the uranium mine; that they had been receiving phone calls three times a week from Mr. McCone urging them to get started on the mine because the uranium was needed; that Howard Hughes of Hughes Aircraft was begging to loan them $200,000 for capitalization of the mine as working capital. Catalina then asked Mr. Aguilar if instead the Aguilars could loan them $10,000; that if the Aguilars could, then defendants could give Mrs. Aguilar a title as a consultant in the corporation from which she could draw $500 a month for life or at least for five years; that defendants could repay the Aguilars the loan right away. Mr. Aguilar informed Catalina that Mrs. Aguilar owned some securities but that he would never ask her for her stocks and bonds. Catalina then replied that she would ask Mrs. Aguilar.

Mrs. Aguilar stated to Catalina that Mr. Aguilar was trying to sell books but was not working regularly and that they didn't have $10,000 that they could loan. Catalina then asked if Mrs. Aguilar didn't have stocks and bonds, and Mrs. Aguilar said that she had ten children and her baby was an invalid and their stocks were all they had to give their children a chance in life. Catalina suggested that Mrs. Aguilar merely borrow against the securities for a very brief period. Mrs. Aguilar stated that she would like to discuss the matter with her brother but Catalina replied that defendants did not want the brother to be informed. Catalina assured Mrs. Aguilar that if the Aguilars would make a loan on the securities the money would be returned in two weeks. Mrs. Aguilar finally told Catalina that she would give Catalina the money as a friendship loan upon the understanding that defendants actually had the money to repay with no problems attached and that there would be no wait for the money.

The Aguilars made two payments to defendants, one by check drawn on the Aguilars' account in the Security First National Bank in the sum of $2,500, and the other in the form of a check of the E. F. Hutton Company for $3,500, payable to Mrs. Aguilar, and endorsed by her. Both of these transactions took place on June 30, 1959.

After the Aguilars had given the $6,000 to defendants they received back from the defendants, on or about July 16 or 17, $500 and then on July 21 another check for $1,000. These two checks were delivered by Gael and Mr. Aguilar told him that the Aguilars had to have the rest of their money. Gael replied that the money was in New York, that they actually had it in New York and would pay it. However, the only money received on the $6,000 loan was the $1,500 and the defendants were not accessible again to the Aguilars after July 21.

In exchange for the $6,000 loan, Gael made out a check for $6,500, payable to Mrs. Aguilar and the check was postdated to July 15, 1959. The Aguilars attempted to cash this check on two occasions but it was rejected each time.

After defendants' check was rejected on approximately July 17, 1959, Mr. Aguilar stated that they (Aguilars) tried several times to contact defendants and finally Mr. Aguilar saw Gael going into his hotel on about July 23. Gael stated that he was leaving town. Mr. Aguilar told Gael that he (Aguilar) knew that Gael was a fraud and that the police

had told him that Gael had a record going back three years.[3] Gael said he had to go to Denver and that as soon as he got back the Aguilars would have their money. Gael told Mr. Aguilar that the name of the mine was the Big Horn uranium claim.

Thereafter, although the Aguilars received some letters and telegrams, these communications bore no return address and defendants never did pay back any more of the money. The Aguilars filed a civil action for the recovery of the money.

### C. Facts Relative to Count IV :[4]

Mr. Lowell Noonan, an associate professor of political science at the San Fernando State College, testified that he had met Gael in 1952 when Gael was a student in one of Mr. Noonan's classes in Latin American government at the University of Southern California.

No useful purpose would be served by setting forth the evidence relating to Count IV. Suffice it to say, with some variations on the theme, defendants spoke about the uranium mine and their activities in Peru. That Gael was purportedly in the act of endowing the University of Lima and suggested that he would like to make a lectureship available there to Mr. Noonan.

Mr. Noonan gave defendants his check for $5,000 and pointed out that this money would be his last dime and he would merely make it as a personal loan on the basis of friendship. Gael gave Mr. Noonan a promissory note.

Mr. Noonan's check for $5,000 was cashed but Mr. Noonan never saw defendants again, although he made numerous attempts to contact them. Mr. Noonan finally filed a civil action against defendants for the recovery of the money.

### D. Evidence Relating to the Several Counts:

Mr. Harry Kuhfus, an employee at a gas station on Beverly Boulevard, serviced the automobiles driven in by Gael.

---

[3]This statement concerning a ''record'' serves as the basis for defendants' contention that the district attorney was guilty of prejudicial misconduct. This contention will be dealt with infra.

[4]Count IV provides in pertinent part as follows:

''. . . H. GAEL BALDWIN and CATALINA BALDWIN are accused . . . of the crime of GRAND THEFT in violation of section 487, subdivision 1, Penal Code . . . [in that defendants] on or about the 20th day of July, 1959 . . . did wilfully, unlawfully and feloniously take Five Thousand and no/100 dollars ($5,000.00), in money . . . the personal property of Lowell G. Noonan.''

Gael talked to Mr. Kuhfus from time to time about Gael's big interests in Peru including 100,000 acres of coffee and an immense contract with the Peruvian Government. Mr. Kuhfus suggested to Gael that there were also plenty of opportunities in this country because he (Kuhfus) had an option on a piece of property in Nevada that would bear investigation. Gael then asked Mr. Kuhfus all about the property and Mr. Kuhfus showed Gael the assays and engineering reports that indicated it might have uranium and that there was also some copper showing. Mr. Kuhfus, however, told Gael that he didn't know whether it would pay or not. Mr. Kuhfus testified that no one had ever operated the mine; that it was only a prospect; and there was only one hole in the ground about 10 feet deep. Mr. Kuhfus had an option to purchase this property from a Mr. Rhodimer. Mr. Kuhfus gave Gael permission to buy his option for which Gael paid nothing. In response to the question of whether Gael ever owned any part of the mining property Mr. Kuhfus testified that Gael "never owned a cactus bush on that property."

Mr. Rhodimer, the owner of the "mine," was very old and there was an affidavit from doctors that it would be fatal for him to come to court. A cashier's check dated June 30, 1959, endorsed by Mr. Rhodimer under the endorsement of Gael was introduced in evidence. The record shows that the extension of the option was in the form of a letter dated June 25, 1959, stating that the option of October 1, 1958, was being extended effective on the payment to Mr. Rhodimer of $5,000. Mr. Kuhfus testified that his option ended July 31, 1959.

A representative of E. F. Hutton Company testified that a loan was made to Mrs. Aguilar on June 30, 1959, in the sum of $3,400 [Mrs. Aguilar used her stock as security]. A bank representative testified that Gael had an account in the Security Bank from April 1958 to August 1958 and during those five months there was one deposit ticket for $2,000, but the bank had to deposit $14.27 in order to close the account. A representative of the State Division of Corporations testified that there was no record of a permit for defendants to sell stock, nor any permit of any kind for the sale of Peruvian Corporation stock.

Carlton Clark, a detective sergeant with the Los Angeles Police Department extradited defendants from New York and testified that Gael stated to him that he was in the process of forming a Peruvian corporation.

Gael testified and admitted that Resources, Incorporated,

was never organized in Peru; that he had told Mrs. Aguilar that he had to make a payment to tie up a uranium property; that his income tax return for the year 1957 would not show income in excess of $5,000, but that during that year (1957) he had borrowed $15,000 for Resources, Incorporated, in Peru; that none of it was repaid; that his income for the year 1958 would show a return not to exceed $4,000, but during that year he had borrowed $15,000; that his income tax return for the year 1959 would show no earnings but in that year he had borrowed $11,000 from the Aguilars and Mr. Noonan alone.

The trial judge summed matters up when, just prior to the imposition of sentence he stated in pertinent part:

"The court has weighed and balanced all the considerations which occurred to the court, in an attempt to determine a course of action in this case.

"... [T]his is not the case of an individual aberration, a single aberration. This is a series of takings of money, each of which amounted to grand theft, and in substantial sums. We have a shocking difference between the personal family histories of these defendants and their careers and their procedure in attempting to promote this wild scheme.

"I don't see how anybody could ever have reposed in these letters and contracts the confidence which they said they did. I think the case of the Aguilars is particularly reprehensible. To take that money, even borrow it, upon these representations, from a family with so many children and such limited finances, and to recognize that they must have struggled in very difficult circumstances to accumulate that amount of money, is, I think, an indication of the characteristics of this project all the way through.

"To the court, it seems to be thoroughly saturated with fraud, and it is the essence of what is known as a 'confidence game,' which relies upon the confidence which the potential victims have in the people who defraud them, because of the fact that their backgrounds are good, and their connections seem to be on an elegant plane, and other matters which appeal to the non-thinking 'investor' who turns his money loose in such a wild, fantastic and amazing scheme as this. It is almost on the verge of psychopathy, it seems to the court. . . ."

Defendants' arguments on this appeal fall into two categories—purported misconduct (a) on the part of the trial court and (b) on the part of the district attorney.

Defendants assert three contentions relative to purported misconduct on the part of the trial court. First, that the court's examination of defendants violated their constitutional right to appear and defend with counsel; second, that the trial court by its examination of defendants indicated to the jury that the court disbelieved defendants, and finally, third, that the trial court in commenting on the evidence indicated its disbelief of the defendants.

In addition to the fact that none of the contentions has merit, defendants failed to make any objections at the time of trial and the rule is well established that defendants cannot raise the issue for the first time on appeal. (See *People* v. *Corrigan*, 48 Cal.2d 551 [310 P.2d 953]; *People* v. *Pedesclaux*, 216 Cal.App.2d 1 [30 Cal.Rptr. 574]; *People* v. *Mathews*, 205 Cal.App.2d 543 [23 Cal.Rptr. 111]; *People* v. *Johnson*, 203 Cal.App.2d 624 [21 Cal.Rptr. 650]; *People* v. *Posada*, 198 Cal.App.2d 535 [17 Cal.Rptr. 858]; *People* v. *Jones*, 191 Cal.App.2d 478 [12 Cal.Rptr. 777]; *People* v. *Miller*, 185 Cal.App.2d 59 [8 Cal.Rptr. 91]; *People* v. *York*, 174 Cal.App.2d 305 [344 P.2d 811].)

It is well established that a trial judge may properly engage in reasonable examination of witnesses during the course of a trial. (*People* v. *Rigney*, 55 Cal.2d 236 [10 Cal. Rptr. 625, 359 P.2d 23]; *People* v. *Mathews, supra*, 205 Cal. App.2d 543 [23 Cal.Rptr. 111].) What is stated at page 241 of *People* v. *Rigney, supra*, is apposite as follows:

"A trial judge may examine witnesses to elicit or clarify testimony (*People* v. *Corrigan*, 48 Cal.2d 551, 555 [310 P.2d 953]; *People* v. *Ottey*, 5 Cal.2d 714, 721 [56 P.2d 193]; *People* v. *Carlin*, 178 Cal.App.2d 705, 714-715 [3 Cal.Rptr. 301]; *People* v. *Montgomery*, 47 Cal.App.2d 1, 18 [117 P.2d 437].)

Indeed, 'it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.' (*People* v. *Corrigan, supra*, at page 559.) The trial judge, however, must not become an advocate for either party or under the guise of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness. (*People* v. *Campbell*, 162 Cal. App.2d 776, 787 [329 P.2d 82]; *People* v. *Lancellotti*, 147 Cal.App.2d 723, 731 [305 P.2d 926]; *People* v. *Huff*, 134 Cal.App.2d 182, 187-188 [285 P.2d 17]; *People* v. *Deacon*, 117 Cal.App.2d 206, 209 [255 P.2d 98].)''

No useful purpose would be served by reproducing portions of the reporter's transcript. An examination of the record

discloses that the learned trial judge made every effort to get both the prosecution and the defense witnesses to answer questions. His impartial treatment of witnesses for both sides is clearly shown.

█ Defendants' last contention is that the district attorney was guilty of prejudicial misconduct by "permitting" a witness to testify about Gael's "record."

This contention is likewise totally without merit. First of all, the record does not support the assertion that the district attorney "permitted" a witness to testify about Gael's "record." The reporter's transcript discloses the following which occurred during the district attorney's direct examination of Mr. Aguilar:

"Q. Did you continue trying to contact the Baldwins from that date on?

"A. Yes.

"Q. Will you tell us the things that you did in order to try to locate them?

"A. I called them up, and they weren't there, ostensibly, but I knew they were.

"Q. Just tell us what you did, sir. You were not able to locate them?

"A. That's right.

"Q. You called the hotel?

"A. Yes.

"Q. On several occasions?

"A. Yes.

"Q. In August of 1959 did you attempt to locate the Baldwins?

"A. Yes.

"Q. Did you write letters, or call?

"A. Yes. There was no point, because they were out of town.

"Q. All right. After you received information that they were out of town, did you make some attempt to locate them, or get into contact with them?

"A. No.

"Q. When was the next time you saw the Baldwins after July of 1959?

"A. I saw them on the day they left, which was, I think, the 22nd or 23rd.

"Q. Of July?

"A. I saw Mr. Baldwin, and I spoke to Mrs. Baldwin.

"Q. Did Mrs. Baldwin tell you she was leaving town at that time?

"A. No, she did not.

"Q. Did Mr. Baldwin tell you he was leaving town at that time?

"A. Yes, he did.

"Q. *What, if anything, did he say?*

"A. *I saw him going into the hotel, so I stopped him, and I told him I wanted to talk to him. I said, 'I want to talk to you.' And I told him, 'I know the whole situation now. I know that you are a fraud. You are phonies all the way through. The police have told me that they have a record on you going back three years.'*

"Q. What, if anything, did Mr. Baldwin say?

"A. He was very indignant, and said, 'Why, I'm going to sue anybody who has anything—who says anything of the sort.'" (Italics added.)

It is manifest from the above that Mr. Aguilar's answer to the district attorney's question was not responsive to that question. There is nothing to indicate that the district attorney "permitted" the answer.

In any event, the record is also clear that defendants' attorney did not object or move to strike the answer or have the jury admonished to disregard it. ▬ Where there is no objection, exception or assignment of error made in the trial court, the claim of misconduct of the prosecuting attorney cannot be raised for the first time on appeal. (*People v. Volk*, 221 Cal.App.2d 291 [34 Cal.Rptr. 351, 355]; *People v. Garland*, 215 Cal.App.2d 582 [30 Cal.Rptr. 437]; *People v. Crossley*, 213 Cal.App.2d 561 [28 Cal.Rptr. 922]; *People v. Roberts*, 213 Cal.App.2d 387 [28 Cal.Rptr. 839]; *People v. Eisenberg*, 213 Cal.App.2d 121 [28 Cal.Rptr. 583]; *People v. Stadnick*, 207 Cal.App.2d 775, 779 [25 Cal.Rptr. 35]; *People v. Klavon*, 202 Cal.App.2d 765, 768 [21 Cal.Rptr. 99].) The present case was not a close case. After discharging competent counsel which this court had appointed to aid and assist appellants in the presentation of their appeal, appellants sought and received permission to file a so-called supplemental brief [i.e. a supplement to the brief filed by appointed counsel who was discharged by appellants] in their own behalf. The supplement is a large document, approximately 3½ inches in thickness, unindexed and unpaged, wherein appellants in effect reargue the factual matters which were presented to the trial court. Such law

points as have been presented have been considered and are found to be without merit. Subsequent to the oral argument the appellants have filed what may be called a supplement to the supplement which is likewise unindexed and little more than a repetition of what has already been covered. There is no merit to any contention therein made.

There is no reversible or prejudicial error in the record. The evidence of guilt is clear.

The judgments are and each of them is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 19, 1964.

