[Crim. No. 12669. Second Dist., Div. One. July 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES RONALD HARRELL, Defendant and Appellant.

Byron Y. Appleton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Michael J. Smolen, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—The trial court found defendant guilty of rape (§ 261 subd. 1, Pen. Code) and denied his motion for a new trial. He appeals from the judgment and order denying the motion. The purported appeal from the order is dismissed.

Around 8:30 in the morning of May 14, 1965, Minnie Jefferson, 16 years old, in A-11 grade at Fremont High School, was on her way to school when defendant drove up in a pink 1956 Dodge and asked her if she wanted a ride; she did not reply. Defendant said, "You want a ride, because I'm by myself and, well, I can't hurt you, or nothing"; then Minnie got into the vehicle. As defendant drove past the school she asked where he was going; he said he was going to his sister's house to get some money. On the way Minnie asked if his name was John Moore; he replied affirmatively. Defendant stopped in front of a house on Santa Barbara and went to the rear; while he was gone Minnie copied on her book cover the name "John C. Moore, 3615 Carlin" from the registration in the car. Defendant returned and told her that she had to get out because his sister had gone to the wash house and would be right back; she got out of the car and they went upstairs and sat down. Defendant enticed her into the bedroom to look at the view; before she could say anything he threw her on the bed. When he started "fooling around" she told him she didn't want to do anything like that because she got into trouble before because of that. Defendant then proceeded to have two acts of intercourse with Minnie against her will and with force and violence all

of which time she was yelling and fighting him. By the time she was able to put on her clothing defendant had left the house; later the same day she reported the incident to the police. Minnie described defendant to the officers as being five feet six or five feet seven and weighing approximately 130 pounds.

Officer Knott, having received information that a 1956 Dodge was registered to John C. Moore, 3615 Carlin, Lynwood, went to that address; Moore said that he had sold the vehicle to one LaRue. LaRue told the officer he had sold the vehicle to Emma Coats (defendant's mother), residing at 118 East 109th Street. On June 13, around 7:30 p.m, Officer Knott had a conversation with defendant at that address; he advised defendant that he had a right to remain silent, a right to services of an attorney, and that anything he may say could be held against him as evidence in any future criminal or juvenile court proceeding. The officer pointed to the 1956 Dodge registered to John C. Moore and asked him if it was his; defendant said it was and that he owned the vehicle for about three months, and that he had nothing else to say. Officer Knott also had a conversation with defendant's mother, Mrs. Coats. He asked her who owned the vehicle; she stated that she purchased it for her son Charles (defendant). The officer asked, ''Well, who drives the car besides you?''; she replied that Charles drove the car; she drove it sometimes but had been sick and Charles was the only one who had been driving the vehicle.

After his arrest, defendant was pointed out by Minnie in a lineup of three boys at the police station. At both the preliminary hearing and the trial she positively identified defendant as the man who raped her.

Defendant's brother-in-law, Ivory Kemp, testified for the defense that around May 14, 1965, he borrowed a 1956 Dodge from defendant's mother, and kept the car a week or longer because he needed it for transportation to go to work; he is five feet nine and weighs approximately 150 pounds; and on May 14, around 8:30 a.m., he was driving the Dodge and saw Minnie Jefferson on her way to school, picked up Minnie, drove her to the corner of Santa Barbara and Western and dropped her off. He denied raping Minnie; Minnie later testified that Ivory had not raped her, and positively identified defendant as the man who had. Defendant's mother testified that on May 14 she loaned the car to Kemp; she was sick and

Kemp told her he wanted to use it for work; she could not remember every having told Officer Knott that she had loaned the car to defendant instead of Kemp. Haywood Anderson, shop foreman at Abe Spencer's Body and Fender Shop testified that defendant worked there from May 1 through June 19; that it "could have been [defendant] was off some days, I don't remember"; "I would say" he was working May 14, 1965. Defendant testified that between 8:30 a.m. and 11 a.m. on May 14, 1965, he was at work at Abe Spencer's Body and Fender Shop; he had never had an act of intercourse with Minnie nor had he ever seen her prior to the preliminary hearing; he is six feet tall and weighs 170 pounds; in the lineup at the police station there were two others, a Negro about the same height, weight and complexion as he, and a Caucasian or Mexican; he did not drive the 1956 Dodge at all during the month of May; he has a sister who lives at 76th and Compton but is not acquainted with the location on West Santa Barbara.

Appellant concedes that if the trial judge believed the testimony of the prosecutrix, all of the elements of rape of a female under the age of 18 years have been proved except the requirement that the act be "accomplished with a female not the wife of the perpetrator" (§ 261, Pen. Code); this element, he says, was not proved by direct evidence that he and Minnie were not husband and wife, and "indirect evidence of the fact will not suffice," citing *People* v. *Henry,* 142 Cal.App.2d 114 [298 P.2d 80]. In *Henry,* the conviction for rape was reversed on the ground that the prosecution had failed to establish the corpus delicti, a part of which was the nonmarriage of the female to the perpetrator of the crime. As characterized by the court therein, "This is an unusual case." (P. 119.) There was no testimony that the prosecutrix had not been married to someone else, although she did testify that she had not been married to defendant. The difficulty in the proof arose out of her failure to testify that she had sexual relations with defendant or that he was the perpetrator of the rape. Other than his confession, there was nothing to show who committed the act. Thus, in the absence of a showing that she had not been married to someone else, the corpus delicti had not been established. The court ruled that since the identity of the perpetrator had never been established, there was no evidence that the prosecutrix was not married to him. Therefore, there was a sound basis in *Henry* for the court's holding that "There was not sufficient proof of the nonmar-

riage of Vickie to establish the nonmarriage element of the corpus delicti, and there was not a proper foundation for receiving the alleged confession in evidence.'' (P. 121.) There is no such factual situation here. Minnie testified that it was defendant who had sexual intercourse with her; and the evidence is sufficient to establish, at least prima facie, that defendant and Minnie were not husband and wife. She was not asked if she was married to defendant on May 14, 1965, and it would have been a simple matter for the prosecutor to do so, but Minnie's testimony establishes that she was not the wife of defendant. She testified that her name is Minnie Jefferson; she had never seen defendant before 8:30 a.m. on May 14, 1965, and that the acts occurred shortly thereafter; she asked defendant his name at least twice and then copied the name ''John C. Moore'' from the registration in the vehicle while defendant was in the house (the evidence shows that defendant's name is Charles Ronald Harrell); and she was 16 years old and in A-11 grade at Fremont High School. The only reasonable inference that can be drawn from this testimony is that Minnie was not the wife of defendant on May 14, 1965.

██ It is apparent from the cases that a direct statement of nonmarriage from the prosecutrix is not a necessary element of the crime of rape if there is sufficient evidence to establish prima facie that the parties were not married. (*People* v. *Peters,* 149 Cal.App.2d 94. 97-98 [308 P.2d 42]; *People* v. *Nankervis,* 183 Cal.App.2d 744, 750 [7 Cal.Rptr. 263]; *Smith* v. *Superior Court,* 140 Cal.App.2d 862, 864 [295 P.2d 982].) Said the court in *Peters* at page 99: ''Appellant also insists that there was no showing by any direct evidence of the nonmarriage of Mrs. Stevens to him. It would have been better if the district attorney had straightforwardly established that there was no marriage between them, which unquestionably could have been done, and the problem would not now be before us. We believe, however, that the disparity in ages and the complete differences of the names was sufficient to establish, prima facie, that they were not married. (*Smith* v. *Superior Court, supra; People* v. *Allison,* 44 Cal. App. 118 [185 P. 992].)'' (*People* v. *Peters,* 149 Cal.App.2d 94, 99 [308 P.2d 42].) ██ Not only was Minnie's testimony, establishing prima facie proof of the fact of nonmarriage, unrepudiated, but defendant confired that Minnie was not his wife on May 14, 1965, by testifying that the first time he ever saw Minnie was at the preliminary hearing.

█ Appellant's next argument relates to the matter of identity of the perpetrator of the act, largely based on an inconsistency between Minnie's description to the police and her testimony concerning the identity of the man who raped her, and on the trial judge's remark that "most of us are unable to judge exactly or even reasonably correctly as to the weight and size of individuals." He contends that there was insufficient evidence to support the conviction because Minnie's testimony "was inherently improbable as to [his] identity as her assailant."

Minnie had reported to the police that the man who raped her was five feet six or five feet seven and weighed approximately 130 pounds. About a month later at the station out of a lineup of three boys—the defendant, a Negro approximately the size and weight of defendant, and a Caucasian or Mexican—she identified the defendant. Again Minnie identified him at the preliminary hearing. While at the trial the prosecutor asked Minnie if she, on May 14, 1965, saw "the defendant in this case, the person seated at the end of the counsel table?" and she answered "Yes"; and the court asked, "He is the defendant; you know him, you have seen him before?" to which Minnie responded "Yes," her identification of defendant then and later was positive. The evidence shows that defendant is six feet tall and weighs 170 pounds which differs from the description originally given by Minnie to the police. But after her identification of defendant at the lineup and at the preliminary hearing and her initial identification of him at the trial, Minnie thereafter was asked repeatedly by the trial judge if defendant was her assailant—at the conclusion of defendant's cross-examination. He ordered defendant to stand and told Minnie to "look at this boy again, . . . is there any doubt in your mind about him being the one who raped you, had sexual intercourse with you?" Minnie replied, "That's the one." The court said, "Are you sure he is the one?" she replied, "Yes." Calling attention to her prior description that the man was about her size, the judge asked, "And you say now you are still certain he is the one who took you to the apartment?"; Minnie said, "Yes." At the suggestion of defense counsel, Ivory Kemp stood up and the judge asked Minnie the same questions as to him; in response to his request that she look closely at Ivory and tell him if he was the one who took her for the ride on that morning, Minnie shook her head in the negative; again the judge asked, "Which one rode you in their car a few

blocks down Santa Barbara?'' and Minnie said, ''That one [indicating defendant]''; ''That is the only one, Mr. Harrell [defendant]?'' and Minnie replied, ''Yes, sir.'' Again the judge questioned, ''You're still sure of that?'' Minnie answered, ''Yes, sir''; then, ''You never saw him before that date'' and she said, ''No, sir.'' But, ignored by appellant in his argument is the additional evidence, corroborating Minnie's positive identification, that establishes (testimony of Officer Knott) that defendant's car was registered to ''John C. Moore,'' (testimony of Minnie) that this car was the one in which defendant took Minnie to the place where the acts were committed and that before she left the vehicle she copied on her book cover the name ''John C. Moore'' from the car's registration.

The strength or weakness of identification evidence is a matter for the trier of fact. (*People* v. *Jones,* 221 Cal.App.2d 408, 409 [34 Cal.Rptr. 535].) While an inconsistency on the identity issue existed between Minnie's description of defendant to the police and her subsequent testimony, this alone does not require the court to reject the latter. (*People* v. *Austin,* 198 Cal.App.2d 669, 672 [18 Cal.Rptr. 209].) ''In the present case, W had ample opportunity to observe her assailant. Her testimony was far from being inherently improbable. At the trial she exhibited no uncertainty with respect to the subject of the identity of the appellant as the perpetrator of the crime. The appellant's contention is without merit.'' (*People* v. *Austin,* 198 Cal.App.2d 669, 672 [18 Cal.Rptr. 209].) The trial judge, clearly aware of the inconsistency and recognizing that Minnie was ''obviously'' not ''too bright,'' and the inability of most persons to judge correctly the weight and size of others, observed, ''This happened not once but twice, apparently, and I think she had a pretty good idea who did it, so I am inclined to . . . believe her . . . .'' giving her testimony credence. Certainly there is nothing in her testimony to render it inherently improbable, nor is her testimony patently false. We find no basis upon which to set aside the trial judge's finding.

 Appellant's claim that he did not receive a fair trial —because of the judge's repeated interference during the trial and because he was denied the right to effective counsel, is also without merit. He cites various instances in which he claims that the judge aided the prosecutor by questioning witnesses at length and establishing many elements of the crime. We have read the transcript of the oral proceedings

and are impressed with the fact that, realizing the seriousness of the charge, the ease with which one can be accused of such an act and that the prosecutrix was a young school girl, "not too bright," the trial judge was cautious about giving credence to her testimony and weighing the evidence. He did establish Minnie's name and birthdate, then permitted the prosecutor to proceed; he later asked Minnie various pertinent questions—to some, objections were interposed by defense counsel but none were directed to his interrogation. No interruption was made to direct or cross-examination by defense counsel of any witness, nor in any manner was defendant precluded from proceeding as he wished. On the prosecutor's cross-examination of Ivory Kemp it was apparent that he was taking too much time; finally the judge said, "Let's see if we can't speed it up" and took over some of the examination. Certainly he showed no bias when he told the prosecutor at one point, "You should stop worrying about this boy [Ivory]," for none of the evidence showed that Ivory did anything other than give Minnie a ride. We doubt that the prosecutor needed any assistance, nor was he given any, but we surmise from his extensive examinations that the judge felt that he was taking too much time; we agree. In any event, the judge's interrogation of some of the witnesses was to the exclusion of neither defense counsel nor the prosecutor. The matter of identity obviously concerned him and he made every effort to ascertain the truth; again and again he questioned Minnie. The judge's inquiry of the prosecutor as to how he was able to establish the name John C. Moore in connection with defendant, was reasonable, as were questions he asked Officer Knott.

█ A trial judge may engage in reasonable examination of witnesses during the course of a trial and question them for the purpose of eliciting further testimony or clarifying testimony on material points. (*People* v. *Baldwin,* 223 Cal. App.2d 720, 730 [36 Cal.Rptr. 40]; *People* v. *Rigney,* 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 196].) █ Indeed, it is the duty of a judge to conduct a trial in such manner that the truth will be established in accordance with the rules of evidence (*People* v. *Corrigan,* 48 Cal.2d 551, 559 [310 P.2d 953]); and it is apparent here that he had two motives—to facilitate the trial and to clarify certain testimony on material points. █ His questions were reasonable and in no manner reflected bias or prejudice or that he had become an advocate for one side against the

other. Moreover, we do not see how defendant could have been prejudiced by the court's interrogation of some of the witnesses. The case was tried to the court sitting without a jury. Applicable here is the court's comment in *People* v. *Jenkins*: "There is no merit in defendant's contention that the trial judge committed error in questioning Holcomb after the attorneys had completed their examination of this witness. The case depended largely upon the credibility of this witness, and the court's interrogation of Holcomb reflects only the court's attempt to make certain that the record contained the whole truth, so far as it could be elicited from that witness. [Citations.] The court did not interfere with any examination by counsel. Defendant was allowed to cross-examine further after the court's questioning. Since this was a court trial, there was no problem of a juror's drawing any inferences from the court's conduct." (*People* v. *Jenkins*, 231 Cal.App.2d 928, 933 [42 Cal.Rptr. 373].)

Finally, perhaps for want of a meritorious issue, appellant levels an unfair and unsupported indictment against the deputy public defender who represented him at the trial. He accuses him of failing to represent him to the best of his abilities, to such an extent that the conduct of the trial became a mockery of justice. Appellant could not be more in error. Defense counsel was active during the trial—interposing objections, making motions, cross-examining witnesses at length and putting on the best defense possible under the circumstances, offering various alibi witnesses including defendant. In answer to appellant's present complaint that his counsel "neglected to develop any part of [his] story from his own lips," we do not know what more counsel could have developed after defendant denied that he had raped Minnie or even had seen her prior to the preliminary hearing, and testified that he had been working on May 14, 1965. His counsel's conduct needs no defense here and we refuse to dignify appellant's irresponsible accusations with further comment.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.